640 So.2d 622 (1994)
STATE of Louisiana
v.
Solomon P. CAMPBELL.
No. 93-KA-1959.
Court of Appeal of Louisiana, Fourth Circuit.
May 26, 1994.
*623 Ike Spears, New Orleans, for defendant/appellant.
Harry F. Connick, Dist. Atty. of Orleans Parish, Jack Peebles, Asst. Dist. Atty. of Orleans Parish, New Orleans, for plaintiff/appellee.
Before WARD, WALTZER and LANDRIEU, JJ.
WALTZER, Judge.

PROCEDURAL BACKGROUND
Defendant was charged with violation of LSA-R.S. 40:967, possession of 28 to 200 grams of cocaine. Defendant was arraigned and entered a plea of not guilty. He filed a pre-trial motion to suppress, which was denied. Defendant then entered a plea of guilty under State v. Crosby, 338 So.2d 584 (La.1976), reserving his right to appeal. The trial court sentenced defendant to five years in the custody of the Department of Corrections, sentence to run concurrently with any other sentence.

FACTS
On January 11, 1993, Officer Stephen Imbraguglio received information from a confidential informant. The informant was known to the officer because of past information provided and the officer testified that information supplied by the informant in the past is directly responsible for a dozen convictions and that his or her information is highly reliable. In the instant case, the informant told the officer the individual's correct legal name (Solomon P. Campbell), his correct physical description, the exact address where he resided (2238 Dante St. Apt. B), the correct description of his car (Burgundy Nissan Maxima), the exact vehicle license plate number, the exact address of the location from which he dealt (8729 Jeanette St.), the method by which he conducted his transactions (through runners), and the names of several of his runners, including a runner known as the "Black Midget". The informant told Detective Imbraguglio that appellant kept the bulk of his supplies at 2238 Dante St., Apartment B. The informant explained that the appellant would hide the drugs under the house at 8729 Jeanette St. and deal from that location, restocking as needed from the Dante location.
*624 Acting upon the informant's information, Detective Imbraguglio sent one surveillance team composed of Detectives Kenneth Watzsky and Jerome Lavolet to the Dante Street address and a surveillance team composed of Detectives James Keen and Roy Vickers to the Jeanette St. address. Detectives Imbraguglio and David Lemoine were in a third vehicle maintaining radio contact with the two surveillance teams.
Detectives Watzsky and Lavolet observed the defendant depart from his home at 2238 Dante St. Apt. B, walk out of a gate and enter a vehicle matching the description and license plate given by the informant. They so reported to Detectives Imbraguglio and Lemoine who followed the defendant. The defendant of his own free will then drove to the exact address provided by the informant, 8729 Jeanette Street. Detectives Keen and Vickers were notified by radio that the defendant appeared to be driving in their direction. At approximately 5:10 p.m. the defendant arrived and parked his car in front of 8729 Jeanette St. Defendant entered the yard through the closed, but unlocked chain link front gate. Detective Keen was able to observe Solomon Campbell through the chain link fence as Campbell took a clear baggie containing a bulk of white substances out of his jacket and placed it under the house. Defendant then exited the yard, got on a bicycle and rode across the street and met with the "Black Midget", whose real name is David Barnes. Defendant and Barnes engaged in brief conversation. Detective Keen observed Campbell give a small object to Mr. Barnes. Campbell then rode away on his bike, as Barnes began walking in the opposite direction. This information was radioed to Detective Imbraguglio who ordered his men to stop the suspects. When Detectives Keen and Vickers approached Mr. Barnes, he turned from their direction and swallowed the object he had received from the appellant. A search was conducted on Mr. Barnes, but no drugs were found.
Detective Imbraguglio stopped the defendant at the intersection of Eagle and Jeanette Streets. The defendant was advised that he was under investigation for narcotics violations. Detective Imbraguglio advised the defendant of his rights and conducted a pat down search. Detective Imbraguglio testified that he felt a large bulge in the defendant's jacket pocket. The defendant informed the Detective that the bulge was money, specifically he stated, "That's my money". The Detective removed $1700 in cash from the defendant's pocket.
Detective Imbraguglio and the defendant relocated to 8729 Jeanette St. Detective Keen informed Detective Imbraguglio that he had retrieved the baggie the defendant had placed under the house earlier. The baggie contained eight smaller plastic bags and each one of the bags had several pieces of crack cocaine. It was eventually determined that the bag contained over 28 grams of crack cocaine.
The defendant and Mr. Barnes were placed under arrest for possession with intent to distribute crack cocaine.
A large crowd of individuals had gathered and the crowd began verbally expressing hostility towards the police. Detective Imbraguglio was aware that defendant's brother occupied the apartment directly in front of the defendant's, specifically at 2240 Dante Street. Detective Imbraguglio further testified that he knew that defendant had relatives living directly across the street from 8729 Jeanette and he was afraid that they or someone in the hostile crowd would telephone the defendant's brother and tell the brother to remove defendant's stash of drugs from 2238 Dante or that there might have been another person already in the Dante Street house when they first started their surveillance and that person could remove or destroy a stash of drugs.
The Detectives then proceeded to the defendant's residence at 2238 Dante St. The Detectives used the defendant's keys to open the door, enter the residence, and secure it by determining that no one else was in the house. The police then locked the premises and went back to police headquarters to apply for a search warrant. Upon securing the search warrant, the detectives went back to 2238 Dante and conducted a search of the house. The detectives retrieved the following items in the search:

*625 (1) a glass vial or tube containing a white powder residue;
(2) a strainer;
(3) magnite cut;
(4) a phone bill in the name of the defendant; and
(5) a Radiofone beeper invoice bearing the defendant's name.
Detective Imbraguglio testified that no drugs were found in the house. The defendant was then transported to Central Lock-up and booked with possession with the intent to distribute crack cocaine under LSA-R.S. 40:967.

ERRORS PATENT
A review of the record for errors patent reveals one. The trial court has imposed an illegally lenient sentence.
Defendant was sentenced pursuant to LSA R.S. 40:967 F:
Any person who knowingly or intentionally possesses twenty-eight grams or more, but less than two hundred grams, of cocaine... shall be sentenced to serve a term of imprisonment at hard labor of not less than five years, nor more than thirty years, and to pay a fine of not less than fifty thousand dollars, nor more than one hundred fifty thousand dollars.
LSA R.S. 40:967 G provides: "the adjudication of guilt or imposition of sentence shall not be suspended, deferred, or withheld, nor shall such person be eligible for probation or parole prior to serving the minimum sentences provided by Subsection F." The trial court failed to stipulate that defendant's sentence was to be served without the benefit of parole.
Neither the State nor the defendant have argued that the sentence is illegally lenient. An appellate court may not amend or set aside an illegally lenient sentence on its own motion when the defendant alone has appealed and the State has not sought review of the sentence. State v. Fraser, 484 So.2d 122 (La.1986).
"Article 882 B still requires an application for review of an illegal sentence by either the defendant or the prosecutor." (Fraser, supra.)(At 124).
Accordingly, defendant's sentence cannot be disturbed by this court in the absence of action by the State under the dictates of the Louisiana Supreme Court in Fraser.

ASSIGNMENT OF ERROR
On appeal, defendant raises one assignment of error. Defendant argues that the trial court erred in denying his motion to suppress the evidence on the grounds that defendant was entitled to a reasonable expectation of privacy of the underneath area of the raised house on Jeanette Street. Defendant further argues that because of that reasonable expectation of privacy, the officers could not search the underneath of the Jeanette Street house without a warrant, unless one of the exceptions to the search warrant requirement existed and no such exception existed in this case.

PRIVACY & POSSESSION OF THE PREMISES ARGUMENT
Article I Section 5 sentence one of the Louisiana Constitution provides:
Every person shall be secure in his person, property, communications, houses, papers and effects against unreasonable searches, seizures, or invasions of privacy. (emphasis added).
Defendant claims as his defense that he had a reasonable expectation of privacy in the ground underneath the raised house on Jeanette Street, but he failed to prove that he had any relationship to the property other than the illicit relationship of contraband storage. If he owned the property, he could have produced an act of sale at the hearing on the motion to suppress, but he did not. If he leased the property, he could have produced a copy of the lease or a cancelled rent check at the hearing on the motion to suppress, but he did not. If he leased on an oral lease on a month to month basis, he could have produced at the hearing on the motion to suppress a paid rent receipt or copies of water or electricity or gas bills in his name or at the very least his own affidavit stating that he leased or had some legally recognized possessory interest in the property. If he had any other possessory interest *626 in the property, for example, a contract of bailment or permission of the owner or possessor of the property to use or be on the property, he could have produced it or his own affidavit so stating at the motion to suppress hearing, but he failed to do so.
As far as both this court and the trial court know, the property at 8729 Jeanette Street is either abandoned or is possessed and/or owned by someone other than the defendant. For all this court knows, the lawful owners and/or possessors of the Jeanette Street house may have worked a schedule such that they were not home during defendant's "business hours" and did not even know the defendant was dealing drugs from under their house. There is further nothing indicating that the lawful owners and/or possessors of the house allowed defendant to be on their property or to use their property for such illegal purposes.
We further note that without evidence that defendant had the possessor's or owner's permission to be on his or her property, defendant was trespassing upon the property of another.
Can one have a privacy interest in property of another?
In State v. Kimble, 375 So.2d 924 (La., 1979), the Louisiana Supreme Court found that a defendant who had hidden drugs underneath the vacant trailer next door to his own trailer had no reasonable privacy interest in the vacant trailer next door when it stated:
"Kimble and Spruell had no right to an expectation of privacy beneath the steps of the vacant trailer. The trailer park owner was the party entitled to that right ..." (At 927).
In United States v. Jacobsen, 466 U.S. 109, 112, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984), the Supreme Court stated:
The first Clause of the Fourth Amendment provides that the `right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ...' This text protects two types of expectations, one involving `searches', the other `seizures'. A `search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A `seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property. (emphasis added).
The Court further addressed this issue in note 22 wherein it stated:
Obviously, however, a `legitimate' expectation of privacy by definition means more than a subjective expectation of not being discovered. A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as `legitimate'. His presence, in the words of Jones [v. United States, 362 U.S. 257, 267, 80 S.Ct. 725, 734, 4 L.Ed.2d 697 (1960)], is `wrongful'; his expectation [of privacy] is not `one that society is prepared to recognize as "reasonable".' Katz v. United States, 389 U.S. [347], at 361, 88 S.Ct. [507], at 516 [19 L.Ed.2d 576 (1967)] (Harlan, J. concurring). And it would, of course be merely tautological to fall back on the notion that those expectations of privacy which are legitimate depend primarily on cases deciding exclusionary-rule issues in criminal cases. Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law, or to understandings that are recognized and permitted by society. (emphasis and underlines added).
In State v. Freeman, 503 So.2d 501 (La.App. 4 Cir.1987), this court stated:
No warrant was obtained to either arrest defendant or search for and seize any contraband in his possession. The question becomes whether the warrantless arrest and seizure of the cocaine and marijuana were constitutional, based on probable cause, thus justifying the trial court's denial of defendant's Motion to Suppress the seized contraband.
A warrantless arrest must be based upon probable cause. State v. Nicholas, 397 So.2d 1308 (La.1981); State v. Tuesno, 456 So.2d 186 (La.App. 4th Cir.1984). Probable cause for an arrest exists when *627 the facts and circumstances within the arresting officer's knowledge, and of which he has reasonable and trustworthy information, are sufficient to justify a man of average caution to believe the person to be arrested has committed or is committing an offense. C.Cr.P. Art. 213; Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); State v. Elliot, 407 So.2d 659 (La.1981); State v. Herbert, 351 So.2d 434 (La.1977). It is to be judged by the probabilities and practical considerations of everyday life on which average men, particularly average police officers, can be expected to act. State v. Smith, 377 So.2d 1220 (La.1979); State v. Landry, 454 So.2d 313 (La.App. 4th Cir.1984). (emphasis and underlines added).
In the instant case, the officers personally observed the defendant holding and otherwise possessing the baggie of drugs as he took it from his jacket, thus the officer had first hand knowledge of the defendant's possession. In addition, the officers had information supplied by a reliable informant[1] and the information supplied was detailed and accurate. The information supplied was truly "reasonable and trustworthy". Combining the officers personal viewing of the defendant's comings and goings, his removal of the drugs from his jacket, his meeting and passing of an object to the "Black Midget", combined with the extremely accurate information that they had received that he was dealing crack cocaine from the location which they witnessed, in the manner which they witnessed and to the runner which they witnessed, under the standards of Freeman, supra, the officers were justified in believing that an offence was committed and probable cause existed.
In Freeman, this court further stated:
The test by which a person's "expectation of privacy" is measured is twofold: first, the person must exhibit an actual subjective expectation of privacy and second, the expectation must be one that society is prepared to recognize as reasonable. State v. Dupuis, 378 So.2d 934 (La.1979) cert. dism'd. 446 U.S. 993, 100 S.Ct. 2980, 64 L.Ed.2d 850; cert. den. 449 U.S. 828, 101 S.Ct. 94, 66 L.Ed.2d 32 (1980).
If it is determined that the accused has no reasonable expectation of privacy in the area invaded, neither a warrant nor an exception to the warrant requirement is needed for the seized evidence to be admissible. State v. Ford, 379 So.2d 729 (La.1980).

CURTILAGE ARGUMENT
Defendant in the instant case argues that the underneath area of the raised house on Jeanette Street is curtilage and that curtilage of a house is protected by the Fourth Amendment. We agree that the underneath area of the house would be curtilage and that curtilage is protected by the Fourth Amendment, however it is protected as to someone who possesses, owns, has the permission of the possessor and/or owner, is lawfully on the premises or otherwise has a reasonable societally recognized expectation of privacy. In the instant case, defendant's expectation of privacy, namely that he is entitled to place illegal contraband onto the property of others without government intrusion, is not recognized by society as reasonable. If it were, then drug dealers would be free at will to involve innocent members of the community in their nefarious business by placing the contraband in or around the innocent persons homes with impunity.

CLOSED GATE ARGUMENT
Defendant argues because the Jeanette Street property had a closed, but unlocked chain link gate, "the seized contraband *628 was located in area not open to the public for which the defendant had a reasonable expectation of privacy" citing State v. Karston, 588 So.2d 165 (La.App. 4 Cir.1991). In Karston, the officer entered an unlocked closed solid gate which could not be seen through. In the instant case the gate was chain link and "see-through". In Karston, the officer entered before witnessing a crime in progress. In the instant case, the officers entered after personally viewing a crime. In Karston, the defendant lived at the address which the officers entered. In the instant case, defendant did not live at the address which the officers entered, nor did he prove that he had any right to be there.
In Freeman, above, this court stated:
Defendant asserts the facts of his case are analogous to the facts in State v. Fearn, 345 So.2d 468 (La.1977). We disagree. The facts in Fearn are easily distinguishable. In Fearn, the defendant was growing marijuana in a ditch behind his house. The plants were screened from public view by other weeds and were not openly displayed to public view. The plants could not be seen from a public road or street. There is no question the defendant in Fearn took every possible precaution to hide the marijuana. In the instant case it cannot be said defendant took such precautions to ensure a reasonable expectation of privacy. The officers did not search for the marijuana. Defendant's actions in removing the envelope, taking portions from it and replacing it were bold, cavalier and very open to public view. Defendant may have had a subjective expectation of privacy but certainly not a reasonable one. Officer Keene testified defendant opened his back door and removed the envelope from between the top edge of the exterior of the rear door and the roof joists. There was no roof overhang hiding the area and the back fence was low. All of defendant's actions relative to the envelope containing the marijuana were easily observed by the officers while sitting in their police car parked on a public street. Any passerby could easily have observed the same activity. What a person knowingly exposes to the public is not a subject of Fourth amendment protection. Katz v. United States, supra. The fact that the officers could not see thru the envelope is irrelevant. Here, probable cause involves the probability that incriminating evidence is involved, determined by the "totality of the circumstances" confronting the officers. Illinois v. Gates, supra. The law has recognized that a law enforcement officer may rely on his training and experience to draw inferences and make deductions that might well elude an untrained person. State v. Knowles, 438 So.2d 648 (La.App. 2nd Cir.1983), writ den. 442 So.2d 458, citing United States v. Cortez, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); State v. Evans, 441 So.2d 82 (La.App. 2nd Cir.1983). In the instant case, we find no legitimate expectation of privacy. The incriminating evidence, even though not visible thru the envelope, was "immediately apparent" because the officers had probable cause to believe the contents were contraband. State v. Knowles, supra. citing Texas v. Brown, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). Given the "totality of the circumstances" the envelope was a "suspicious" container which came into plain view of the officers thru defendant's own actions. The officers did not search for the envelope. The seizure of property in plain view by an officer who has the right to be where he is involves no invasion of privacy and is reasonable if there is probable cause to associate that property with criminal activity. State v. Knowles, supra; State v. Evans, supra. (At 506). (Underlines supplied).
In the instant case, the fence was "see-through", unlike the solid gate in Karston, and the defendant's actions in removing the drugs from his jacket and placing them under the house were very open to public view and easily observed by the officers parked on the public street in an unmarked car. Any passerby could easily have observed the same activity. What a person knowingly exposes to the public is not a subject of Fourth Amendment protection.

TOTALITY OF THE CIRCUMSTANCES STANDARD
Probable cause involves the probability that incriminating evidence is involved determined *629 by the "totality of the circumstances" confronting the officers. The "totality of the circumstances" in the instant case includes the information provided by the informant, the fact that every bit of factual information provided proved to be correct, the fact that defendant removed a clear plastic baggie containing a mass of white substance from his jacket, the fact that clear plastic baggies are often used as containers for drugs, the fact that cocaine is white, the fact that drugs are often kept underneath houses, the fact that runners are often used in drug transactions, the fact that the defendant handed an object to someone who had been described as his runner, the fact that the runner swallowed the object when approached by police, the fact that possessors of illegal drugs often attempt to swallow them when approached by police. Thus under the totality of the circumstances, probable cause existed.
At the Motion to Suppress hearing, the defendant separated each individual act and argued that in and of themselves they were not illegal. While it is correct that it is not illegal to enter a gate, to place an object under a house, to hold a clear plastic baggie, to hand someone an object, to have $1700 cash in one's pocket or to swallow something, we do not examine this items one by one but rather look at them all together, in other words we look at the totality of the circumstances. The totality of the two suspects' actions indicated a pattern common to drug transactions.

KNOWLEDGE OF CHEMICAL COMPOSITION OF WHITE SUBSTANCES PRIOR TO ARREST
Defendant further argues that the actions by the defendant prior to the seizure of the bag of cocaine were not enough to raise reasonable suspicion. Defendant argues that Detective Keen testified that he did not observe a drug transaction between the defendant and Mr. Barnes: "[D]id you see him deal drugs at all? No, because we didn't wait long enough to watch that." He further argues that Detective Keen also admitted that he was not certain that the object placed under the house was narcotics, stating that Detective Keen explained that when he saw the defendant take the bag from his jacket, it appeared to be a plastic bag with a bundle of white objects inside of it. Defendant argues that when questioned as to whether or not the detective knew that the object in the bag was narcotics, he answered no:
Q. Okay. When you saw Mr. Campbell place the package beneath the house, you could not tell at that point whether it was narcotics or not, correct?
A. I couldn't be a hundred percent certain, but I believe that it was.
Q. I understand what you believe. You believed it was narcotics because you were there on a narcotics investigation, correct?
A. Correct.
Q. But you couldn't see and independently say that that's crack, that's marijuana, that's powder cocaine, that's heroin, you couldn't' tell what it was from that distance, correct?
A. I answered that, that's correct. (emphasis and underlines added).
Defendant's assertion that the officer said no is factually wrong, a distortion of the testimony, and a misrepresentation to this court. We find that the clear import of the testimony is that he answered "yes" just not 100%. Under defendant's argument, one could never make a narcotics arrest because the police are never 100% sure that the item is a controlled substance until after the item is analyzed by the lab. If this court were to accept defendant's argument, it would be virtually impossible to ever make a drug arrest. This is neither a reasonable interpretation of the law, nor is it the test under law. The officers looked to the totality of the circumstances which indicated a common pattern of criminal activity and saw an item which like other illegal narcotics was kept in a clear plastic baggie and which was white. Based upon the totality of the circumstances, they were reasonably justified in believing that the item in the baggie was contraband.

DRUG TRANSACTION AS MONEY EXCHANGE
Defendant further argues that although the officers saw the defendant hand the runner an object which he swallowed when approached *630 by police, the detectives did not see a drug transaction because the detectives did not see money change hands.
The defense further argues that defendant's case is distinguishable from Freeman and Karston because unlike in Freeman, the detectives in the instant case did not adequately articulate that the defendant's actions raised their suspicion that the defendant was engaging in or about to engage in criminal activity. Defendant Campbell argues that Detective Keen admitted that he did not wait for a drug transaction to occur before seizing the bag from under the house. He further argues that in Freeman the officers observed the defendant sell drugs from his porch and retrieved drugs from the defendant's person.
Lastly defendant argues that in Karston the detectives did observe a drug transaction, but because the detectives invaded the defendant's privacy interest by entering the closed "non-see-through" gate of the apartment complex prior to any suspicious behavior by the defendant, this Court found that the drugs had to be suppressed.
Detective Keen observed the defendant in possession of an object. He described that object as a clear plastic baggie containing a bundle of other white objects within it. This object that the defendant took from his jacket was in full public view. Thus the drugs were in public view. Once the object was placed under the house it was no longer in public view. The detective stated that he was not 100% sure that the bundle was drugs, but he believed that they were based upon his observation of the object when the defendant took it from his jacket. The officer reasonably believed the object to be drugs based upon the totality of the circumstances, including his own observation of the object, his knowledge and experience with drugs and the fact that the confidential informant said he stored the drugs under that house.
Defendant argues that the detectives were premature in stopping the defendant and entering the yard to retrieve the drugs from under the house stating that if the detectives had continued their surveillance they may have observed the defendant retrieve drugs from the house and then sell them. He further argues that none of this occurred, however, and this Court cannot speculate that it would have occurred.
In so arguing defendant confuses a drug transaction with the exchange of money. The officers witnessed an apparent credit sale. Additionally, they need not witness the exchange of money as indicated by this court's ruling in the recently released case State v. Irby, 632 So.2d 801 (La.App. 4 Cir. 1994) writs denied 637 So.2d 461 (La.1994).
The Irby case is almost on point with the instant case:
On June 26, 1991, N.O.P.D. narcotics officers received a tip that the defendant, Michael Irby, was distributing crack cocaine in the area of Plainsfield Drive in eastern New Orleans. The tip indicated that Irby had just moved into the area and that he was distributing the drugs from his cars, a late model Porsche and a Chevy Spectrum. Around that time, they received another tip listing Irby's address as 2769 Jasmine Street and indicating that he stored the drugs at an apartment on Plainsfield Drive and sold the drugs from his sister's apartment at 4000 Hamburg Street, Apartment F, in the St. Bernard Housing Project. The tip also noted that Irby used a Peugeot which was registered in his sister's name. The officers attempted to confirm this information but were unable to do so at that time.
On September 27, 1991, the officers received a telephone complaint that Irby was selling cocaine from a residence in the St. Bernard Project. The tip indicated that Irby kept the drugs at his house on Jasmine Street and that he used a white Suzuki jeep to transport the cocaine. On October 10th narcotics officers set up a surveillance of the Jasmine Street residence and eventually observed the defendant pull up to the house in a white Suzuki and park in the driveway. From their vantage point, the officers were unable to see the vehicle once it had pulled back into the driveway. After waiting a time and not seeing the defendant emerge toward the front of the residence, the officers left *631 their position and drove by the driveway. As they passed by, they looked down the driveway and saw the defendant entering a shed which was located in the rear of the house. They drove back to their original position, and a few minutes later they saw the defendant leave in the Suzuki. They followed him but lost him once he entered the St. Bernard Housing Project.
On October 11th, they again set up a surveillance of the Jasmine Street residence. Soon thereafter, they saw the defendant drive up in the Suzuki, exit the vehicle, and go into the shed at the rear of the property. Remaining there only a few minutes, the defendant left the shed carrying a gray cloth bag. He reentered the Suzuki and left the house. The officers again followed him to the St. Bernard Housing Project, where he pulled into a driveway in the 3900 block of Duplessis Street. He left the Suzuki, carrying the gray bag, and entered an apartment at 3939 Duplessis. He remained there a short time, and when he reappeared he was not carrying the bag. He was stopped as he was reentering the Suzuki, advised of his rights, and advised that he was under investigation for narcotics violations. In response to the officers' questions, the defendant denied that he had entered the apartment and denied knowing who lived there.
The officers took Irby back to the apartment from which he had just emerged. They knocked on the door, which was opened by Kim Miles. In response to the officers' question, she identified the defendant as her cousin. The officers advised her of her rights, advised her that she was also under investigation for narcotics activity, and asked her if she would consent to a search of her apartment. The officers told her that if she did not consent, they would hold her there until they had obtained a search warrant. Ms. Miles told the officers she knew nothing about any drugs and she consented to a search of the apartment. She indicated that the defendant had gone into a bedroom while he was visiting her. The officers entered that bedroom and found the gray cloth bag hidden in a blanket in the bedroom. They opened the bag and found it contained approximately fourteen or fifteen grams of crack cocaine. Approximately $120.00 and a gun were also seized. The defendant was placed under arrest, and he told Ms. Miles to "take the rap" for the cocaine and he would take care of her.
The defendant told the officers that he lived at the Jasmine Street residence with his mother. The officers decided to apply for a warrant to search that residence. As they were taking Irby to their car, he suddenly called out to his mother, who had appeared on the scene, to call Jasmine Street because the officers were going there. Fearing that evidence might be destroyed before a warrant could be obtained, the officers went directly to the Jasmine Street residence. Once there the officers knocked on the door, which was opened by the defendant's brother. The brother refused to allow the officers to enter the house. One officer described the brother as violent and acting irrationally. The officers decided to obtain a warrant to search the house, and a few of them left to prepare it. The defendant's mother soon drove up in the Suzuki, which had been left in the project. When told that a warrant was being prepared, she agreed to allow the officers to search the house.
The defendant was taken into the house and left with one officer while the other officers searched the house. Finding nothing in the house, the officers went to the shed, which was locked. Finding no key in the house or on the defendant, the officers broke into the shed and found a scale and an old lunch box hidden in the rafters which contained approximately twenty-eight ounces of cocaine. When the defendant realized the officers were searching the shed, he ran through the house and exited the back door, but he was captured in the back yard. Prior to the time the officers broke into the shed the defendant's mother indicated that the shed did not belong to them but instead belonged to the neighbors. The neighbors, however, told the officers that the shed belonged to the defendant's house. After the defendant had been taken to police headquarters, *632 he told the officers that he obtained his drugs from two Cubans who lived across the river.
After hearing this evidence, the trial court denied the motion to suppress the evidence seized from Duplessis Street but suppressed the evidence seized from the shed on Jasmine Street. (underlines added).
The court then engaged in a lengthy discussion of the facts bearing on whether there was or was not consent to search the shed. The court concluded that the mother's consent did not include the shed, but did not suppress the evidence seized through that search stating:
Even though the search cannot be justified upon a "consent" basis, the evidence seized from the shed need not necessarily be suppressed. As the State argues, if there was probable cause for the issuance of a search warrant for the residence and the shed, the evidence in the shed would have "inevitably" been discovered in the absence of Mrs. toby's consent. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). As noted in United States v. Crews, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980), there are three exceptions to Wong Sun's exclusionary rule: the independent source doctrine, the inevitable discovery doctrine, and the attenuation doctrine. See also State v. Welch, 449 So.2d 468 (La. 1984); State v. Guy, 575 So.2d 429 (La. App. 4th Cir.1991), writ den. 578 So.2d 930 (1991). Thus, if there was probable cause for the issuance of a warrant for the shed, the evidence need not be suppressed.
In State v. James, 581 So.2d 349 (La. App. 4th Cir.1991), this court set forth the standard of review of the issuance of a search warrant:
C.Cr.P. art. 162 provides that a search warrant may be issued "only upon probable cause established to the satisfaction of the judge, by the affidavit of a credible person, reciting facts and establishing the cause for the issuance of the warrant."
The Louisiana Supreme Court has held that probable cause exists when:
the facts and circumstances within the affiant's knowledge, and those of which he has reasonably trustworthy information, are sufficient to support a reasonable belief that evidence [or] contraband may be found at the place to be searched.
State v. Duncan, 420 So.2d 1105 (La.1982). See also State v. Roebuck, 530 So.2d 1242 (La.App. 4th Cir.1988), writ denied 531 So.2d 764 (La.1988); State v. Scott, 499 So.2d 1248 (La.App. 4th Cir.1986). The facts which form the basis for the probable cause to issue a search warrant must be contained "within the four corners" of the affidavit. Duncan; Roebuck. A magistrate must be given enough information to make an independent judgment that probable cause exists for the issuance of the warrant. State v. Manso, 449 So.2d 480, 482, (La.1984), cert. denied, Manso v. Louisiana, 469 U.S. 835, 105 S.Ct. 129, 83 L.Ed.2d 70 (1984).
In its review of a magistrate's finding of probable cause, the appellate court must determine whether the "totality of circumstances" set forth in the affidavit is sufficient to allow the magistrate(:)
to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband ... will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclu[ding] that probable cause existed." Illinois v. Gates, 462 U.S. 213, 238-239, 103 S.Ct. 2317 [2332, 76 L.Ed.2d 527] (1983). (citations omitted)
See also Manso; Roebuck.
James, at 353-354.
Here, the officers had received information that the defendant was selling cocaine in the St. Bernard Project. The tip indicated that the defendant kept his store of cocaine at his residence on Jasmine Street, and he used a white Suzuki to make deliveries *633 to the project. The officers twice observed him leave his house and drive to the St. Bernard Housing Project in the Suzuki. The second time they observed this, they also saw him take a gray cloth bag from the shed, take it inside an apartment in the project, and leave soon thereafter without the bag. A search of that apartment pursuant to the resident's consent revealed that the gray bag contained cocaine. Given these factors, it appears that there was probable cause for the officers to believe there was cocaine in the shed. Thus, it is quite likely that a warrant would have been issued for a search of the shed and the cocaine would inevitably have been discovered. Therefore, the trial court erred by suppressing the evidence seized from the Jasmine Street shed.
For the foregoing reasons, we reverse that part of the trial court judgment granting defendant's motion to suppress the evidence seized from the Jasmine Street shed and remand this case for further proceedings.
We note that in Irby, supra, the officers did not view an exchange of money or anything approaching a sale. They merely saw the defendant enter an apartment carrying a gray bag and leaving the apartment without the bag. Further the bag in Irby was not "see-through".
Defendant in the instant case was not charged with sale or distribution, but rather with possession under R.S. 40:967. Sale is not an element of the crime with which defendant was charged, hence, the State is not required to prove a sale and the officers are not required to witness one, although it appears that in the instant case, the officers did witness a credit sale.
For the reasons discussed, the denial of the motion to suppress, conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] At the hearing on the Motion to Suppress, counsel for defendant engaged in numerous questions aimed at disclosing the identity of the confidential informant. Specifically he asked the name, sex, and drug habits of the informant. He also asked if the informant had purchased drugs from the defendant that day and when he received an affirmative answer, he asked whether the informant had purchased drugs from the defendant between noon and five p.m. The officer also answered yes to this question. Counsel attempted to identify the confidential informant presumably to challenge whether in fact an informant actually existed in light of the officers' prior knowledge of the defendant and his drug activities. The trial court apparently concluded that an informant did exist and defendant did not raise this assertion on appeal.