676 So.2d 160 (1996)
STATE of Louisiana
v.
Larry HULS.
No. 95 KA 0541.
Court of Appeal of Louisiana, First Circuit.
May 29, 1996.
*164 Duncan S. Kemp, III, District Attorney and William Quin, Assistant District Attorney, Amite, for Appellee, State.
Michael Thiel, Hammond, and Corbett L. Ourso, Jr., Hammond, for Appellant, Larry Huls.
Before LOTTINGER, C.J., and GONZALES and FITZSIMMONS, JJ.
GONZALES, Judge.
Larry Huls was indicted with first degree murder. The state amended the charge to second degree murder, a violation of La. R.S. 14:30.1, and defendant pled not guilty and not guilty by reason of insanity. The jury found defendant guilty, and the court sentenced him to serve a term of life imprisonment without benefit of parole, probation, or suspension of sentence. Defendant has appealed, urging fifty-nine assignments of error.[1]

FACTS
On Wednesday, October 21, 1992, defendant killed his ex-wife, Ann Erdey. The victim owned a beauty shop in Hammond. She was last seen alive walking out to her van to leave the shop at about 7:45 p.m. on that day. Before leaving the shop, the victim talked to her boyfriend on the phone and told him she would meet him at her house so they could go pick up her son from the baby-sitter. The victim's son was born while defendant and the victim were married. The boy has cerebral palsy and is a quadriplegic. After the victim failed to come home as planned, her boyfriend and her parents filed a missing person's report.
On October 22, 1992, the victim's van was recovered in New Orleans. Inside the van, investigators found a Tupperware container with urine in it. The investigators later discovered that a fingerprint on the container matched the print from defendant's left middle finger. A ballistics expert collected a *165 casing from the van and determined a bullet recovered from the victim was a .25 caliber.
Authorities located the victim's body on October 29, 1992. The body was found buried in Tangipahoa Parish in almost 2 feet of dirt in a small wooded area near the interstate. The pathologist who conducted the autopsy found a gunshot wound between the eyebrows and a tight and securely fastened ligature around the victim's neck. He determined the cause of death was the gunshot wound. He also said the victim could have died of strangulation if the ligature had been placed around her neck prior to the gunshot. Due to the body's decomposition, the doctor was unable to determine whether the body was subjected to the shooting or the strangulation first. During the autopsy, the pathologist noticed bruises on the victim's left arm and left forearm but found no indication the body had suffered a severe beating. He also found a dental plate immediately behind and above the victim's tongue. On cross-examination, he said the teeth were dislodged during trauma, but he admitted the teeth could have become dislodged if the victim fell forward and struck her head after being shot or if the body was dragged.
Initially, defendant was not a suspect in the case. On October 26, 1992, an FBI agent questioned defendant about the victim's disappearance. Defendant was upset that the victim was missing. He told the agent he and the victim had had an amicable divorce, but admitted they had had differences over money since the divorce. Defendant also told the agent he owed his ex-wife about $11,000.00 in child support and business expenses. When asked about his whereabouts on the previous Wednesday, defendant said that, in the morning, he stopped in at a restaurant which he owned and operated. From about 1:00 p.m. until 4:30 or 5:00 p.m., he was alone at a camp on the Tangipahoa River. At about 5:00 p.m., Kathleen Mapes Goldberg arrived to bring him aspirin and a coke. Goldberg worked for defendant at his restaurant, and they had previously dated. He then went back to his house and took a nap. At about 7:00 p.m., he went to the home of Annette Lusk, his girlfriend, to watch a World Series baseball game. When the game ended, they went to a bar, where they stayed until about midnight. After they left the bar, they went to a restaurant to eat, and then they returned home.
Initially, Goldberg and Lusk corroborated defendant's statement concerning his whereabouts. When first questioned, Goldberg told the investigators defendant had not felt well on Wednesday and had gone to her brother's house on the river. She also told them she took defendant some aspirin, coke, and a candy bar at about 3:00 p.m. When first questioned, Lusk told the authorities defendant arrived at her residence between 7:00 and 7:30 p.m. on Wednesday. Both women later recanted these statements. Goldberg explained she was frightened about her own involvement in the offense and did not want to be further involved. Both women said defendant had told them what to tell the investigators.
Subsequently, Goldberg, Lusk, and Ulysses George provided the investigators with information concerning defendant's involvement in the victim's disappearance. Defendant spent Tuesday night at Lusk's house. He set the alarm for 4:00 a.m. and told her he had paperwork to do. When the alarm went off Wednesday morning, he got up and left. Lusk did not see him the rest of the day. At about 4:30 a.m. on Wednesday, defendant went into Goldberg's house and awakened her. He then had Goldberg drive him to the victim's house. As Goldberg drove slowly by the house, defendant rolled out of the car, and Goldberg drove away. Defendant did not tell Goldberg what his plans were, but he told her he would be at the restaurant by 10:00 or 11:00 a.m. However, Goldberg did not see defendant that day. A few days earlier, defendant had warned Goldberg he might want her "to do something" for him.
At about 8:30 on Wednesday night, defendant went to George's house and asked George to go for a ride. George recognized the van as being the specially-equipped van used to transport defendant's son. Defendant was nervous and told George he had "popped" the victim. George noticed the victim's body on the floor of the van and saw a small caliber silver gun with a white handle *166 on the floor between the seats. Defendant drove the van to a wooded area, and George helped defendant carry the body into the wooded area. Defendant then asked George to get rid of the van and gave him about $40.00 or $50.00 for gas. Complying with defendant's request, George drove the van to a housing project in New Orleans and left the windows down and the keys in the van.
At about 9:50 p.m., defendant called Lusk and asked her if she was alone. When she told defendant she was, he told her he would be there in a few minutes. When he arrived, he asked her if she had ever lain under something like a couch for twelve hours. They then went to a bar, and later to a restaurant.
Early on Thursday morning, defendant again went to Goldberg's house. He told Goldberg the victim was going to turn up missing that day. He then washed his clothes and took a shower. When he came to work, he told Goldberg what to tell the police if they asked questions about his whereabouts. Defendant also told her he had been stuck in his wife's van all day. When she asked him how he was able to spend all day in the van without urinating, he told her he had used a Tupperware container. He appeared nervous that he had left the container in the van. He told Goldberg the victim's body would never be found because he had left it in a small strip of wooded land where hunters never went. He also told her the gun would never be found.
On Thursday night, George received a call from defendant asking him to meet defendant at a particular location on Friday morning. At about 3:00 a.m. on Friday morning, George helped defendant dig a hole and bury the victim in the wooded area. Lusk remembered that early on Friday morning defendant received a phone call. After talking on the phone, he left; but he was back in bed when she woke at 6:30 a.m. When Lusk realized the victim was missing, she asked defendant if he was involved. Initially, he told her he did not murder the victim. However, when she questioned him further, he told her he had someone else kill the victim and the body would never be found. Defendant told Lusk to tell anyone who asked that he had been with her on Wednesday evening between 7:00 and 8:00.
When the FBI agent interviewed defendant again, on October 27, 1992, the agent told defendant the alibi evidence had proven to be false. As the agent described the evidence, defendant began to breathe rapidly. When the agent asked defendant to take the investigators to the body, defendant said, "I can't bring you to the body until I talk to my attorney."
About 6 or 7 weeks before the offense, defendant had borrowed a .25 caliber pistol from Robert Gilland, a man who serviced the amusement machines located in defendant's restaurant. The description of this gun was similar to the gun George observed in the van. On the Thursday after the victim disappeared, Gilland asked defendant about the gun. Defendant told him he had "hocked" the gun. When Gilland asked defendant to get the gun back, defendant said he would. Eventually, defendant brought Gilland a gun. However, the gun was not the one defendant had borrowed from Gilland.

IMPROPER ALLOTMENT
In assignment of error number 2, defendant contends the allotment method used to allot his case to a particular division of the 21st Judicial District Court (21st JDC) was improper as it allowed manipulation by the state. He also complains that one entire division of court was excluded from the allotment process because it was hearing only family cases.
The first degree murder indictment against defendant was returned on December 10, 1992. According to testimony and the rules of court for the 21st JDC, indictments rendered in capital cases are allotted, as soon as the indictment is filed to the next division in alphabetical order.[2] Rules of Court for the Twenty-First Judicial District Court, *167 rule V(2) (amended effective 1/1/85). On the dates applicable in this case, court rules also provided that, in the event indictments are returned in more than one capital case, the docket numbers were to be placed on separate slips of cardboard, and the first docket number drawn was to be assigned to the next division which was scheduled to receive a capital case, in alphabetical order of the divisions. On the date when defendant's indictment was returned, there were no other capital indictments. The parties stipulated that, prior to January 1, 1993, Division "D" heard only family matters and was not part of the rotation system for criminal cases. After that date, Division "A" became the division to hear only family cases, and Division "D" returned to the regular system.
In State v. Simpson, 551 So.2d 1303, 1304 (La.1989) (on rehearing) (per curiam), the Louisiana Supreme Court held that a criminal case allotment system which allows the state to choose the judge who presides over a criminal case violates due process. The Court gave the following instructions for allotment:
To meet due process requirements, capital and other felony cases must be allotted for trial to the various divisions of the court, or to judges assigned criminal court duty, on a random or rotating basis or under some other procedure adopted by the court which does not vest the district attorney with power to choose the judge to whom a particular case is assigned.
551 So.2d at 1304 (footnotes omitted).
Recently, the Supreme Court found that a numerical rotation allotment procedure in which any indictment or information filed by the district attorney is allotted to the "next judge up" invites manipulation of allotments. State v. Reed, 95-0648 (La. 4/28/95), 653 So.2d 1176 (per curiam). Under this jurisprudence, a rotation system is not acceptable if the event which triggers application of the system is dependent upon an action taken by the district attorney. Although a grand jury functions independently of the district attorney, as the testimony in this case makes clear, in a routine capital case the district attorney determines when to submit the case to the grand jury, and thus, can manipulate an allotment system which depends on the return of an indictment. See La.C.Cr.P. arts. 435, 438, 442 and 443. In this case, no other capital indictments were returned on the date of defendant's indictment, and thus, the procedure of drawing docket numbers was not used. Accordingly, we conclude the system used for the allotment of defendant's case violates due process.
Having found the allotment system violates due process, we now must determine if the violation warrants a reversal of defendant's conviction. When the issue of improper allotment has been raised in a pre-trial setting, no showing of prejudice has been required for a defendant to successfully raise the issue and to have his case re-allotted under a proper allotment system. See, for example, State v. Reed, 95-0648 (La. 4/28/95), 653 So.2d 1176 (per curiam); State v. Payne, 556 So.2d 47 (La.1990); State v. Simpson, 551 So.2d 1303 (La.1989) (per curiam). However, if the issue is raised for the first time on appeal, after the defendant has been convicted, the due process violation does not warrant reversal of the conviction absent a showing of prejudice. See, for example, State v. Wisinger, 618 So.2d 923 (La. App. 1st Cir.1993); State v. Claxton, 603 So.2d 247 (La.App. 1st Cir.1992); State v. Jones, 600 So.2d 875 (La.App. 1st Cir.1992), writ denied, 92-2351 (La. 5/12/95), 654 So.2d 346. In these situations, this court has employed a harmless error analysis to determine whether reversal is required. See Wisinger, 618 So.2d at 933; Claxton, 603 So.2d at 249-250; Jones, 600 So.2d at 878-879.[3]
Under prevailing United States Supreme Court and Louisiana Supreme Court jurisprudence, the inquiry for harmless error "is not whether, in a trial that occurred without the error, a guilty verdict would surely *168 have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993); Chapman v. California, 386 U.S. 18, 23-24, 87 S.Ct. 824, 827-828, 17 L.Ed.2d 705 (1967); State v. Johnson, 94-1379 (La. 11/27/95), 664 So.2d 94, 100; State v. Code, 627 So.2d 1373 (La.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994). See also La.C.Cr.P. art. 921.
After reviewing the record in detail, we conclude that the evidence presented at defendant's trial was so strong, unwavering, and consistent that it overwhelmingly indicates that the guilty verdict in this case was correct and surely unattributable to the improper allotment. Therefore, we find no prejudice accrued to defendant due to the error in the allotment system, and thus, find the error was harmless under the particular facts of this case. We note that a different result may have been warranted in another factual setting.
Defendant cites no jurisprudence in support of his remaining argumentthat the allotment process is improper because the division assigned to hear family cases is not included in the rotation system. The thrust of the argument is that a district court has no authority to require, by rule, the referral of particular types of cases to only one division of court. However, jurisprudence has recognized the authority of district courts to establish specialized divisions of court. See State ex rel. Guste v. Green, 94-1138, p. 16 (La.App. 1st Cir. 6/23/95), 657 So.2d 610, 622. See also Simpson, 551 So.2d at 1304 n. 4. Accordingly, we find no merit in this argument.
The assignment of error is without merit.

DENIAL OF MOTION TO SUPPRESS STATEMENTS
In assignments of error numbers 15 and 46, defendant argues the court erred when it denied his motion to suppress statements. He asserts the statement he made to investigators, "I can't bring you to the body until I talk to my attorney," should not have been admitted because he had invoked the right to counsel.
Initially, we note defendant did not make this argument before the trial court at any time prior to introduction of the statement. Although he filed a motion to suppress, he did not include this argument either in the motion or in arguments at the hearing. Thus, he has forfeited the right to argue the ground on appeal. See State v. Wright, 441 So.2d 1301, 1303 (La.App. 1st Cir.1983).
Moreover, we find no merit in the argument. If an accused asserts his right to counsel during an interrogation, he may not be questioned any further until his counsel is present. See State v. Abadie, 612 So.2d 1, 5 (La.), cert. denied, 510 U.S. 816, 114 S.Ct. 66, 126 L.Ed.2d 35 (1993). See also Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981). In the instant case, once defendant indicated he wanted to talk to his attorney before showing the location of the victim's body, the investigators asked him if he was invoking his right to counsel. When he said he was, the questioning ceased. Prior to making the statement, defendant had been advised of and had waived the right to counsel, and he had given no indication that he desired the assistance of counsel. Accordingly, the court did not err in denying the motion to suppress. We find no merit in these assignments of error.

UNTIMELY PRODUCTION OF EXCULPATORY EVIDENCE
In assignments of error numbers 5, 6, 12, 37, and 53, defendant argues the court erred when it denied defendant's pretrial request for exculpatory statements made by 3 state witnesses, and for copies of plea agreements entered into by these witnesses, and when it later admitted testimony by the witnesses despite the state's failure to timely produce the exculpatory evidence.
Prior to trial, defendant filed written motions for discovery in which he asked the state to provide him with a variety of exculpatory evidence, including any exculpatory statements made by state witnesses and any *169 unfavorable evidence about state witnesses. In particular, defendant wanted the state to notify the defense of any deals entered into between the state and Annette Lusk, Ulysses George, and Kathleen Mapes Goldberg, and to produce any statements made by these 3 witnesses. In response to these requests, the state provided a brief summary of the oral statements first given to investigators by Goldberg and Lusk. In these initial statements, Goldberg and Lusk provided an alibi for defendant; in subsequent recorded statements, these 2 witnesses provided evidence of defendant's guilt and admitted their original statements were false. After being provided with the substance of the oral statements, defendant also asked to be provided with copies of the recorded statements. He argued he should receive the recorded statements because they were inconsistent with the original statements. Defendant also said he believed 1 of the unindicted coconspirators, apparently a reference to George, had helped to dispose of the body. Believing that a statement by this person to be indicative of that person's guilt, defendant argued he should be allowed to review the statement for possible use as a defense. The court rejected these arguments and denied the request to view the transcript of the recorded statements; but, after expressing concern that the witnesses might have said defendant did not commit the offense, the court decided to examine the statements in camera.
In response to defendant's request for information concerning any deals made by the state with state witnesses, the state initially responded that there were no deals. Later, the state admitted it had entered into plea agreements with Lusk and Goldberg, but not with George. During the state's opening statement, the prosecutor indicated the state had entered into plea agreements with all 3 witnesses. In the agreements, the witnesses agreed to testify truthfully and cooperate in the case and to plead guilty to accessory after the fact, and the state agreed not to file any additional charges and to recommend a suspended sentence. The agreement with George indicated the state would recommend that he receive credit for time served (9 months) with the balance of the sentence suspended. In opening remarks, the prosecutor also mentioned Lusk and Goldberg gave misleading statements when they initially were questioned by investigators in the case. Prior to the testimony of George, Goldberg, and Lusk, defendant moved for a mistrial, noting he never had been given copies of the plea agreements mentioned in the state's opening, and had not been given copies of the recorded statements made by George, Lusk, and Goldberg. After reviewing the statements, the court concluded they were discoverable under "Brady" and required the state to provide the defense with copies of the statements and the written plea agreements. The court denied the motion for mistrial but assured defense counsel he could have time to review the statements prior to any further testimony. Counsel asked for 5 or 10 minutes to prepare for the testimony of George, who was the state's next witness, and said he did not need any further delay.
The suppression of evidence favorable to an accused by the prosecution violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963). See also Kyles v. Whitley, ___ U.S. ___, ___, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995). Evidence favorable to an accused includes exculpatory evidence as well as evidence which can be used to impeach prosecution witnesses. United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). Favorable evidence is material, and constitutional error results from its suppression by the government, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682 and 685, 105 S.Ct. at 3383 and 3385. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. Bagley, 473 U.S. at 682, 105 S.Ct. at 3383.
In reviewing materiality, this court must provide a cumulative evaluation of the suppressed evidence, keeping in mind the *170 defendant does not have to show that, with the addition of the undisclosed evidence, his trial would have resulted in acquittal, or that there would be an insufficiency of the evidence to support a conviction. The defendant need only show that "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable." State v. Marshall, 94-0461 and 81-3115, (La. 9/5/95), 660 So.2d 819, 826 (quoting Kyles v. Whitley, ___ U.S. at ___, 115 S.Ct. at 1569). Once a reviewing court applying Bagley has found constitutional error, the error cannot subsequently be found harmless. Kyles v. Whitley, ___ U.S. at ___, 115 S.Ct. at 1566.
In the instant case, the issue is the timeliness of the state's disclosure rather than the failure to disclose. Disclosure of favorable evidence by the state must be made at such a time as to allow the defense to use the material effectively in the presentation of its case. State v. Prudholm, 446 So.2d 729, 738 (La.1984). Not all cases involving late disclosure of favorable evidence result in reversible error. We must determine if the late disclosure so prejudiced the defendant that he was denied his constitutional right to a fair trial. See State v. Smith, 430 So.2d 31, 42 (La.1983). See also United States v. Stephens, 964 F.2d 424, 435-36 (5th Cir.1992).
In advance of trial, the state did not provide defendant with copies of the written plea agreements for Goldberg, Lusk, and George; and the record does not show that the state notified defendant George had entered into a plea agreement. Considering the terms of the agreements, the witnesses could be impeached on the basis of bias or interest arising from the inducements offered by the state; and, considering the importance of these witnesses to the state's case, the test for materiality under Bagley is met. Thus, the state was obligated to fully disclose the terms of the agreements. Although defendant was not given this information in advance of trial, he orally was notified Lusk and Goldberg had entered into a plea agreement with the state. Furthermore, he was provided with copies of the agreements for all 3 witnesses prior to their testimony and was given ample time to review the documents. The documents were introduced into evidence and the witnesses admitted entering into the agreements. Thus, the state's tardiness in providing defendant with the agreements did not prevent the defense from using the material effectively in the presentation of its case.
The state also failed to provide defendant with copies of the recorded statements made by these witnesses. The state recognized that the initial statements by Goldberg and Lusk concerning the alibi contained exculpatory evidence, and the state provided defendant with that information. However, the state argued that, because the recorded statements did not in and of themselves contain any exculpatory evidence, the recorded statements did not need to be disclosed. Because defendant received the statements at such a time that he could use them effectively, it is not necessary for us to decide if the very fact Goldberg and Lusk made inconsistent statements results in all of the statements being viewed as favorable evidence. Defendant was not provided with the statements in advance of trial, but he received the statements before the witnesses testified and was given plenty of time to review the documents. On appeal, he argues the inconsistent statements were not given to him until after he had committed himself to a particular defense. He maintains he could have pursued an alibi defense had he had access to the inconsistent statements. These arguments assume he never received any information concerning the alibi statements. However, well in advance of trial, he was given the substance of the initial statements made to investigators by Goldberg and Lusk which supported an alibi defense, and after receiving a transcript of the recorded statements, he did not indicate the need for additional time. Accordingly, we find no error in the court's refusal to grant a mistrial and no merit in these assignments of error.

DENIAL OF MOTION FOR CHANGE OF VENUE
In assignments of error numbers 17, 25-26, 33-35, and 52, defendant argues the court erred when it refused to grant defendant's *171 motion to change venue. He claims that, because of pretrial publicity and the jurors' familiarity with details of the case, it was not possible for him to have a fair and impartial jury.
Although a defendant is not entitled to a jury that is totally ignorant of the case to be heard, the Louisiana Constitution grants the accused the right to trial by an impartial jury. State v. Bennett, 527 So.2d 1126, 1127 (La.App. 1st Cir.1988). See La. Const. art. I, § 16. In deciding whether or not to grant a defendant's motion for change of venue, article 622 of the Louisiana Code of Criminal Procedure requires the trial court to consider if prejudice, undue influence, or any other reason will deny the defendant a fair trial in the parish in which the prosecution is pending. The court also must decide if such prejudice or influence will affect either the answers of the jurors on the voir dire examination or the testimony of the witnesses at trial. State v. Clark, 442 So.2d 1129, 1132 (La.1983).
Factors to consider in determining whether or not a change of venue is appropriate include: (1) the nature of the pretrial publicity and the particular degree to which it has circulated in the community; (2) the connection of governmental officials with the release of the publicity; (3) the length of time between the dissemination of the publicity and the trial; (4) the severity and notoriety of the offense; (5) the area from which the jury is to be drawn; (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant; and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire. State v. Bell, 315 So.2d 307, 311 (La. 1975).
In urging a change of venue for trial, the defendant must establish that there exists such prejudice in the collective mind of the community that a fair trial is impossible. The defendant must show more than mere public knowledge of facts surrounding the offense to be entitled to have his trial moved to another parish. State v. Wilson, 467 So.2d 503, 512 (La.), cert. denied, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985). In unusual circumstances, prejudice against the accused sufficient to mandate a change of venue may be presumed. This presumption of prejudice will attach only when the trial atmosphere is entirely corrupted by press coverage or when it is entirely lacking in the solemnity and sobriety to which a defendant is entitled in a judicial system of fairness. State v. Moseley, 587 So.2d 46, 52 (La.App. 2d Cir.), writ denied, 589 So.2d 1066 (La.1991). See Dobbert v. Florida, 432 U.S. 282, 302-303, 97 S.Ct. 2290, 2302-2303, 53 L.Ed.2d 344 (1977); Clark, 442 So.2d at 1134. If prejudice is not presumed, the defendant must establish the existence of actual prejudice on the part of prospective jurors. See State v. Goodson, 412 So.2d 1077, 1080 (La.1982).
Whether or not a defendant has made the showing required for a change of venue is a question addressed to the trial court's sound discretion, which will not be disturbed on appeal absent an affirmative showing of error and abuse of that discretion. Wilson, 467 So.2d at 512. Although the trial court possesses a broad range of discretion in this area, the reviewing court is required to make an independent evaluation of the facts to determine whether or not the accused received a fair trial unfettered by outside influences. State v. Daniels, 628 So.2d 63, 70 (La.App. 1st Cir.1993).
Applying these precepts, we conclude defendant has failed to show that there was either actual or presumed prejudice against him to the degree a fair trial was impossible. The record indicates that 3 television stations aired reports about the offense. A Baton Rouge station aired only 1 story, a New Orleans station aired 16 segments (the latest on November 20, 1992), and another New Orleans station aired 19 segments (the latest on January 11, 1993). One radio station aired 9 segments on the case, with the latest report on December 15, 1993. (The location of the radio station is not apparent from the evidence.) The offense also was reported in 4 newspapers, the News Digest of Amite (1 article), the Ponchatoula Times of Ponchatoula (3 articles), the Daily Star of Hammond (about 14 articles), and the Times *172 Picayune of New Orleans (stories on 8 different dates with some editions not carrying all of the articles). Only the Daily Star ran stories on the case in a year other than 1992. As late as the week before the trial, articles about the case appeared in the Daily Star.
The newspaper, radio, and television reports are factual accounts of the victim's disappearance and the investigation. Although some of the reports displayed sympathy for the victim's son, there was no attempt to sensationalize the offense. There was evidence of the distribution of the newspapers in the area from which the jury was drawn, but no similar evidence for the radio and television stations. With the exception of the newspaper in Hammond, most of the publicity was in 1992, almost a year and half before the trial. Law enforcement agencies and the District Attorney's Office were the sources of some of the reports, including reports in which defendant was criticized for not cooperating with the investigation and for having no remorse.
The record shows the trial judge, prosecutor, and defense counsel conducted a thorough voir dire of the prospective jurors. Each prospective juror was asked about his knowledge of the case from newspaper accounts or radio and television broadcasts. Most of the jurors were questioned individually about their exposure to publicity. Some of the prospective jurors were unfamiliar with the case. Over 50 prospective jurors were questioned before 12 jurors and one alternate were selected. The court excused for cause only 10 of these prospective jurors based on their exposure to pretrial publicity and their inability to set aside this information. All prospective jurors who could not make an unbiased judgment were excused by the court. After carefully examining the record, we do not find defendant carried his burden of proving he was entitled to a change of venue.
We also find no merit in the assignments (numbers 17, 25, and 26) in which defendant argues the court erred when it denied defendant's general challenges to entire jury panels on the ground the jurors were exposed to pretrial publicity. In each of the general challenges for cause, defendant actually was complaining about the court's refusal to grant the motion for change of venue. In the next section, we address the court's denial of challenges for cause of specific jurors based upon exposure to publicity. Because we find no error in the court's denial of the motion for change of venue, the denial of the general challenges for cause presents nothing additional for us to review. These assignments of error are without merit.

DENIAL OF CHALLENGES FOR CAUSE BASED ON PRETRIAL PUBLICITY
In assignments of error numbers 18-20, 22-24, and 28, defendant maintains the court erred when it denied challenges for cause of certain jurors who expressed familiarity with the case.
Defendant exhausted his peremptory challenges. Thus, if he establishes an erroneous denial of a defense challenge for cause, prejudice is presumed, and there is reversible trial court error. See State v. Ross, 623 So.2d 643, 644 (La.1993).
Article 797 of the Louisiana Code of Criminal Procedure provides several grounds for which a prospective juror may be challenged for cause, including the following:
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence; ....
The trial court is vested with broad discretion in ruling on a challenge for cause, and its ruling will be reversed only when a review of the entire voir dire reveals the court abused its discretion. State v. Robertson, 92-2660 (La. 1/14/94), 630 So.2d 1278, 1281. When a juror holds an opinion or impression of the defendant's guilt derived from news publicity, the trial court should grant the defendant's challenge for cause of the prospective juror unless the "juror declares, and the court is satisfied, that he can render an impartial verdict according to the *173 law and the evidence." State v. Smith, 491 So.2d 641, 646 (La.1986) (quoting La.C.Cr.P. art. 797(2)).
Carolyn Rushing (assignment of error number 18) was one of the first jurors questioned. She was familiar with the case from having read about it in the local newspaper; and she said she had formed an opinion. Repeatedly, she said she would be able to set aside her opinion and base her decision on the evidence presented. She also said she had not read anything in the paper which would affect her evaluation of witness credibility. When she said she did not think she could start from "scratch" because of what she had read, the court questioned her further, and she said she would put aside what she had read and base her decision on the evidence. Later, she explained she believed it was only natural for anyone who had been exposed to publicity in the case to have formed an opinion. She believed that after listening to the attorneys during voir dire she was more open-minded about the case, and she agreed there were 2 sides to every story. After the court denied defendant's challenge for cause, defendant exercised a peremptory challenge to excuse Rushing.
When Floyd Shropshire (assignment of error number 20) initially was questioned about the case, he said he was not familiar with the crime. After being told a few of the facts, he recalled reading about the case when it first happened. He said he had not formed any opinions and was not aware of specific details about the offense. When defendant challenged Shropshire for cause, it was in the nature of a general, continuing challenge for cause of all of the prospective jurors based on defendant's belief the case should be transferred to another venue. When the court denied the general challenge, defendant accepted Shropshire as a juror. Later, defendant went back and excused Shropshire peremptorily. Counsel explained he had since discovered Shropshire's brother was his "client's" cell-mate. Defendant did not attempt to have Shropshire excused for cause on that ground.
Larry Taylor (assignments of error numbers 22 and 23) recalled reading about the case and said he had developed strong opinions. When asked if he could set aside his opinion, he initially said he did not know and expressed concern that his opinion would always be lurking in the back of his mind. Taylor recalled specific details about the case, but he indicated he was good at following instructions and would be able to set aside the information he knew about the case. When he later said defendant was at a disadvantage, the court told him he was giving conflicting responses. After further questioning, he told the court he had not made up his mind in the case and would be able to accept the law as the court instructs. Defendant voiced both a general and a specific challenge for cause. In denying the challenge for cause, the court mentioned Taylor's intellectual capacity was sufficient for him to be able to distinguish between his previous impressions and the evidence. Defendant then exercised a peremptory challenge.
Sharon Dantzler (assignment of error number 24) remembered hearing about the case, but she did not recall any details and had not formed an opinion. She also said she did not have any particular feelings about the case when she first heard about it. Defendant raised his "standing challenge for cause" which the court denied. Defendant then challenged Dantzler peremptorily.
Alice Hoyt (assignment of error number 28) also said she was familiar with the case. A few years earlier she had been a patron at the victim's beauty shop. She could not remember what she had heard about the case, and she explained she had been busy with her job as a teacher when the crime occurred. She also said she had not formed an opinion in the case and would be able to set aside the information she had heard. The court denied defendant's challenge for cause, and Hoyt was later selected as a juror.
The responses of these prospective jurors do not indicate any of them could not be fair and impartial. Thus, we find no abuse of discretion in the trial court's denials of these challenges for cause.
In assignment of error number 19, defendant asserts the court erred when it denied the challenge for cause of Oliver Martinez, *174 juror number 145. However, the court did excuse this juror for cause. In his brief, defendant argues the court erred when it refused to excuse 5 other jurors who were present in court when Martinez made a variety of comments. Martinez said he was building homes in the area where the victim was found and had formed an opinion that defendant was guilty of the offense. Although most jurors were questioned individually, this particular panel was questioned as a group. Although Martinez expressed his opinion in the presence of 5 other jurors, the record does not show the other jurors were prejudiced in any manner by comments made by Martinez. Defendant refused the court's offer to question other jurors to determine if they were influenced by the comments. Thus, we find no merit in this argument.
These assignments of error lack merit.

DENIAL OF CHALLENGES FOR CAUSE FOR OTHER REASONS
In assignments of error numbers 21, 27, and 29, defendant claims the court erred when it refused to excuse Melissa DePaula for cause because she worked for an assistant district attorney, and when it refused to excuse Alice Hoyt for cause on the ground she knew the victim and had a sister who had been murdered.
Initially, we note that, although defendant does not list these assignments of error as being abandoned, we could consider them abandoned as not being briefed. See Uniform RulesCourts of Appeal, rule 2-12.4. Defendant cites no jurisprudence in support of the issues, nor does he make any particular argument. In his brief, in the section dealing with the court's denial of the motion for change of venue, defendant merely summarizes the facts concerning the court's denial of these unrelated challenges for cause.
In any event, we find no merit in these assignments. In addition to the ground for challenge for cause quoted in the previous section (juror impartiality), La.C.Cr.P. art. 797(3) provides for a challenge for cause when "[t]he relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict[.]"
Melissa DePaula (assignment of error number 21) was a college student who had a part-time job running errands for a law firm. When asked if she had any close friends or relatives who worked at the District Attorney's office, she said she did not. She also said she was not aware that one of the partners in the law firm where she worked was an assistant district attorney who served as a prosecutor in City Court. When asked if that would have any influence on her, she said it would not. She said she did not feel she would owe the attorney any explanation were she to serve as a juror. Occasionally DePaula also delivered papers for another attorney who worked in the same building. When she was told this other attorney also was an assistant district attorney, she said she was unaware of his position. She maintained that the positions of these attorneys, as assistant district attorneys, would not affect any decision she would make in this case. Defendant challenged DePaula for cause on the basis of her employment by an assistant district attorney. The court denied the challenge, and defendant exercised a peremptory challenge. We find no indication that the relationship would influence DePaula's decision, and thus, no error in the court's ruling.
Alice Hoyt (assignments of error numbers 27 and 29) said she was a patron of the victim's beauty shop in the spring of 1989. The victim was not her hair dresser, and Hoyt had no conversations with her. Hoyt said this acquaintance would not influence her decision as a juror. Defendant challenged Hoyt for cause on the ground her familiarity with the victim would give her outside information about the location of the shop. Noting the location of the shop was not a real issue, the court denied the challenge. Defendant's request for additional peremptory challenges was denied, and Hoyt was selected to be a juror.
A prospective juror's acquaintance with a victim is not in itself a ground for a challenge for cause under La.C.Cr.P. art. *175 797. There must be a showing that the relationship would influence a juror in arriving at a verdict. State v. Mills, 505 So.2d 933, 945 (La.App. 2d Cir.), writ denied, 508 So.2d 65 (La.1987). After reviewing Hoyt's responses during voir dire, we find no indication that her familiarity with the victim and the victim's shop would have any influence on her decision.
Hoyt also said her sister was murdered in 1983 when she was strangled by her husband. Hoyt was aware that both her sister and her sister's husband had been drinking. She was not aware of the crime for which her brother-in-law was convicted, and she was not upset with the penalty he received. She maintained the experience would not influence her decision if she were selected as a juror. Defendant challenged Hoyt for cause on the ground her sister's death would influence her ability to be fair and impartial. The court denied the challenge.
The murder of Hoyt's sister, in and of itself, is not a sufficient reason to excuse Hoyt for cause. Our review of Hoyt's responses reveals she was able and willing to be an impartial juror. Cf. State v. Thom, 615 So.2d 355, 360 (La.App. 5th Cir.1993). These assignments are without merit.

REFUSAL TO GRANT ADDITIONAL PEREMPTORY CHALLENGES
In assignments of error numbers 30-32, defendant argues the court erred when it refused to grant defendant's request for additional peremptory challenges. He contends he should have received additional peremptory challenges because he was forced to use some of his peremptory challenges to excuse jurors who should have been excused for cause. Article 799 of the Louisiana Code of Criminal Procedure mandates that in trials punishable by death or necessarily by imprisonment at hard labor, a defendant shall have 12 peremptory challenges. We have found no error in the court's denial of the challenges for cause. Since there is no provision for the grant of additional challenges, the trial court did not err in the denial of defendant's request. See State v. Mayer, 589 So.2d 1145, 1149 (La.App. 5th Cir.1991), writ denied, 609 So.2d 251 (La.1992). These assignments of error lack merit.

INTRODUCTION OF GRUESOME PHOTOGRAPHS AND VIDEOTAPE
In assignments of error numbers 36 and 38-40, defendant claims the court erred when it admitted photographs and a videotape of the victim's body being exhumed. He claims these exhibits were not necessary to prove the elements of the offense and merely served to inflame the jury and invoke sympathy.
Prior to trial, defendant filed a motion in limine seeking the exclusion of all photographs of the victim. At the hearing held on the motion, defendant emphasized his primary objective was to exclude any photographs of the victim's body which were taken at the location where the body was exhumed. After viewing the photographs which the state intended to introduce, the court ordered the state to partially mask 2 of the pictures. As a result of the masking, Exhibit S-35 shows the victim's open mouth, with teeth missing, and Exhibit S-36 shows someone's hands holding the bridgework which was found in the victim's throat. All other portions of these 2 pictures are not visible. During the trial, defendant also objected to introduction of Exhibits S-14, S-15, S-16, and S-17. These pictures were taken during the excavation process and show the recovery of the body at various stages. The only body parts visible in the pictures are the victim's hands, arms, 1 foot, and a portion of 1 lower leg. All other body parts are either not visible or are covered with dirt. In all but 1 of the pictures, the victim's hands have been covered to prevent damage.
Defendant also objected to introduction of a videotape made during the excavation process. The court overruled the objection but instructed the state to stop the video at that point when the body is excavated.
Defendant also objected to introduction of Exhibits S-29, S-30, and S-33. Exhibit S-29 is a picture of the victim's shoulders, neck, and lower head. In the picture, the victim's body has been cleaned, and the picture was not taken at the location where the body was *176 found. The ligature which was secured around the victim's neck is seen in the picture, and the victim's face is covered by someone's hands as that person points to the location of the ligature. Exhibit S-30 shows the ligature after it has been cut. Exhibit S-33 was taken during the autopsy and is a close-up view of the bullet wound.
The admission of gruesome photographs and videotapes will not be overturned unless it is clear the prejudicial effect of the evidence outweighs its probative value. Admission of such evidence will not be found in error unless the photographs and videotapes are so gruesome as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient other evidence. Gruesomeness of photographs and videotapes does not, in and of itself, prevent admissibility. See State v. Bourque, 622 So.2d 198, 236 (La.1993). Postmortem photographs and videotapes at the scene are admissible to prove corpus delicti, to provide positive identification of the victim, and to corroborate other evidence establishing the cause of death, the manner in which death occurred, and the location, severity, and number of wounds. Bourque, 622 So.2d at 236.
The photographs and videotape introduced in this case are not unduly gruesome or inflammatory. Although decomposition of the body is evident in some of the pictures, the partial masking of 2 of the pictures and the presence of hands covering portions of the body in some of the other pictures reduces the risk of prejudice. The body is not visible on the portions of the videotape which were shown to the jury. The photographs and videotape of the excavation corroborate testimony concerning care taken during the excavation process to avoid damaging the victim's body, thus rebutting any assumption the victim's teeth were knocked into her throat during the excavation process. (The state argued the presence of the teeth in the victim's throat showed specific intent.) The pictures of the ligature are relevant to show its location around the victim's neck. When we balance the probative value of the photographs and videotape with the remote likelihood the jury was inflamed simply upon viewing these exhibits, we find the probative value of the evidence outweighs the possible inflammatory effect. The trial court did not err in its rulings. These assignments of error lack merit.

INSUFFICIENT EVIDENCE
In assignments of error numbers 42, 43, 50, 51, 55, and 56, defendant argues the evidence at best supports only a conviction for manslaughter. Defendant does not deny he was the person who shot the victim. Claiming the state failed to prove specific intent to kill or to inflict great bodily harm, he argues the verdict should have been manslaughter because the victim's death occurred while defendant was engaged in the perpetration or attempted perpetration of assault, aggravated assault, simple battery, second degree battery, or aggravated battery. Alternatively, defendant avers the verdict should have been manslaughter because the killing was committed in sudden passion or heat of blood.
The standard of review for sufficiency of the evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude the state proved the essential elements of the crime and defendant's identity as the perpetrator of that crime beyond a reasonable doubt. State v. Pittman, 93-0892 (La.App. 1st Cir. 4/8/94), 636 So.2d 299, 302. In conducting this review, we also must be expressly mindful of Louisiana's circumstantial evidence test, i.e., "assuming every fact to be proved that the evidence tends to prove," every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. See State v. Northern, 597 So.2d 48, 50 (La.App. 1st Cir.1992).
When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable *177 doubt that the defendant was guilty of every essential element of the crime. State v. Jacobs, 504 So.2d 817, 820 (La.1987). See also Northern, 597 So.2d at 51.
The applicable definition of second degree murder in this case is the killing of a human being "[w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" La. R.S. 14:30.1(A)(1). Specific criminal intent is the "state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific intent may be proved by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. Pittman, 636 So.2d at 302.
In this case, specific intent to kill or inflict great bodily harm can be inferred from the fact defendant shot the victim once between the eyes and attached a ligature about her neck. Although George, Goldberg, and Lusk testified defendant did not discuss with them any plan he had to murder the victim, there is evidence he planned the offense in advance. A few days before the offense, defendant told Goldberg he might want her to do something for him. As a result, Goldberg was not surprised when defendant woke her and asked her to drive him somewhere. The statement defendant made to Ulysses George after the offense, that he had "popped" the victim, and the statements he made to Goldberg and Lusk concerning the offense are direct evidence of specific intent. The evidence shows a motive for defendant to murder the victim. According to defendant's statement to an FBI agent, defendant owed the victim about $11,000.00 in past due child support and business expenses. He was having financial problems, and a contempt hearing in the child support case was scheduled for October 26, 1992, just a few days after the offense. There also was evidence defendant was disappointed whenever he received calls from the victim.
Further, defendant's activities after the murder are consistent with a finding of specific intent to kill. He tried to conceal his involvement in the offense by burying the body in a location where it would not be found. He also asked George to get rid of the van, and asked Goldberg and Lusk to provide an alibi for him. The circumstances under which he borrowed and failed to return the gun are indicative of specific intent and guilty knowledge. Under these circumstances, the evidence was sufficient to establish beyond a reasonable doubt that defendant had specific intent to kill or to inflict great bodily harm. Having found sufficient evidence of specific intent, we now must determine if the circumstances indicate the crime was actually manslaughter. Manslaughter is a homicide which would be either first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. La. R.S. 14:31(A)(1). "Sudden passion" and "heat of blood" are not elements of the offense of manslaughter; rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed without them. State v. Lombard, 486 So.2d 106, 110 (La.1986). The state does not bear the burden of proving the absence of these mitigatory factors. A defendant who establishes by a preponderance of the evidence that he acted in a "sudden passion" or "heat of blood" is entitled to a manslaughter verdict. Lombard, 486 So.2d at 111. In reviewing the claim, this court must determine if a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found the mitigatory factors were not established by a preponderance of the evidence. Lombard, 486 So.2d at 111.
The only evidence of any provocation in the instant matter, was the victim's frequent calling of defendant on the phone at his place of business and her seeking of a contempt ruling against defendant for his failure to pay child support. According to defendant's statement to the FBI agent, on October 21, 1992 the victim called him 3 or 4 times at his restaurant and it was not unusual for her to call so frequently. Goldberg *178 testified defendant did not like the calls and sometimes just put the phone down and walked away. Even if the victim's conduct is viewed as provocation sufficient to deprive defendant of his self control and cool reflection, it was reasonable for the jury to conclude defendant's blood had cooled or an average person's blood would have cooled by the time the offense was committed. See La. R.S. 14:31(A)(1). There is no indication either the victim or the victim's attorney abused the legal system in their efforts to force defendant to pay money to support his disabled son; there is no evidence of the content of the victim's phone calls to defendant; and there is no indication the victim threatened defendant in any of the phone calls. These assignments of error are without merit.

REFUSAL TO INSTRUCT THE JURY AS TO THE PENALTY FOR MANSLAUGHTER
In assignments of error numbers 44 and 45, defendant argues the court erred when it refused to charge the jury on the possible sentence for manslaughter.
During a conference held to discuss the court's planned jury instructions, the court said it intended to charge the jury on the penalty for both second degree murder and manslaughter. Defendant objected to the court's plan to instruct the jury that defendant was entitled to probation or a suspended sentence if convicted of manslaughter. Defendant argued he might not be eligible for probation if he had a prior criminal conviction. Defendant asked instead for the court merely to read the language of the statute which does not include any reference to the possibility of probation. After hearing argument, the court decided not to refer to the penalty for manslaughter; and in the final instructions to the jury, the court told the jury the penalty for second degree murder but did not refer to the penalty for manslaughter.
When a penalty imposed by statute is a mandatory one, the trial judge must inform the jury of the penalty on the request of the defendant. However, where the sentence is not mandatory and the court has the discretion to impose a sentence anywhere within the statutorily authorized range, the trial judge is not required to charge the jury on the authorized sentence, but may do so in his discretion. State v. Napoli, 428 So.2d 957, 962 (La.App. 1st Cir.), judgment set aside on other grounds, 437 So.2d 868 (La. 1983).
The penalty for manslaughter is not mandatory. Considering the disagreement over the language to use in the instruction and the court's concern that, without the instruction concerning probation, the jurors would be left wondering if the penalty for manslaughter is to be served without benefit of parole, probation or suspension of sentence, as is the penalty for second degree murder, we find no abuse of discretion in the court's decision to not instruct the jury on the penalty for manslaughter. These assignments of error are without merit.

MANDATORY SENTENCE
In assignment of error number 57, defendant claims the mandatory sentence required for second degree murder is a violation of the principle of separation of powers. He apparently contends mandatory sentencing provisions are a violation of the court's sentencing discretion.
Initially, we note the record before this court does not contain a copy of a motion to reconsider sentence or evidence that defendant orally moved for reconsideration of the sentence. Although defendant "note[d] assignment of error to the Court's sentence" immediately following imposition of sentence, defendant did not voice any particular objection to the sentence. The failure to file or make a motion to reconsider sentence precludes a defendant from raising an objection to the sentence on appeal. See La.C.Cr.P. art. 881.1(D). Thus, defendant is barred procedurally from having this assignment of error reviewed. See State v. Duncan, 94-1563 (La.App. 1st Cir. 12/15/95), 667 So.2d 1141 (en banc per curiam).
Moreover, we find no merit in the assignment. Defendant cites no authority in support of his argument. Nor does he claim imposition of a life sentence without benefit *179 of parole is constitutionally excessive punishment in this case. As the Supreme Court indicated in State v. Dorthey, 623 So.2d 1276, 1278 (La.1993), it is the legislature's prerogative to determine the length of the sentence imposed for crimes classified as felonies, and courts are charged with applying these punishments unless they are found to be constitutionally excessive. A mandatory life sentence for second degree murder does not violate the principle of separation of powers. See La. Const. art. II, § 2. See generally Dorthey, 623 So.2d at 1278-79; State v. Normand, 285 So.2d 210, 211 (La.1973). Accordingly, this assignment of error lacks merit.

DENIAL OF MOTION FOR NEW TRIAL
In assignment of error number 58, defendant adopts the arguments from the other assignments of error and argues the cumulative error requires the granting of a new trial. We have carefully reviewed each assignment of error briefed by defendant and have found no reversible error. Furthermore, the combined effect of the incidences complained of did not deprive defendant of the right to a fair trial. There is no cumulative prejudicial impact nor is there a denial of due process. See State v. Copeland, 530 So.2d 526, 544-45 (La.1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989); State v. Linson, 94-0061, p. 8 (La. App. 1st Cir. 4/7/95), 654 So.2d 440, 444-45, writ denied, 95-1120 (La. 9/22/95), 660 So.2d 470. This assignment of error is without merit.

PATENT ERROR
In reviewing the record for patent error, we have found error in the sentence. The trial court did not give defendant credit for time served. See La.C.Cr.P. art. 880. Accordingly, we amend the life sentence to reflect defendant is to be given credit for any time served prior to execution of his sentence. See State v. King, 604 So.2d 661, 670 (La.App. 1st Cir.1992). Resentencing is not required. However, we remand the case and order the district court to amend the commitment and the minute entry of the sentencing to reflect defendant is to be given credit for time served.
We also notice the minutes state the court ordered the sentence to be served without benefit of "probation, pardon, or suspension." The transcript indicates the court properly ordered the sentence to be served without benefit of parole and did not place any restrictions on the possibility of a pardon. The transcript prevails in the event of such a discrepancy. See State v. Lynch, 441 So.2d 732, 734 (La.1983). Resentencing is not required. However, we order the district court to correct the minute entry of the sentencing, and if necessary, the commitment.
We also notice the sentence is illegally lenient as the court did not order it to be served at hard labor. See La. R.S. 14:30.1(B). We will not correct this error as the error is in defendant's favor and the state has not appealed the illegal sentence. See State v. Fraser, 484 So.2d 122, 124-125 (La. 1986).

DECREE
The conviction is AFFIRMED. The sentence is AFFIRMED as AMENDED. The case is REMANDED to the district court which is ordered: (1) to amend the commitment and the minute entry of the sentencing to reflect defendant is to be given credit for time served, and (2) to correct the minute entry of the sentencing, and if necessary, the commitment, to reflect that defendant's sentence is to be served without benefit of parole, not without benefit of pardon.
NOTES
[1] Some of the assignments of error listed in defendant's brief do not correspond by number to the list of assignments filed in the record. The following assignments either were specifically abandoned in defendant's brief or were not briefed, and thus, are considered abandoned by this Court: 1, 3, 4, 7-11, 13, 14, 16, 41, 47-49, 54 and 59. Some assignments which defendant listed as being abandoned were briefed, and thus, have been reviewed in this appeal.
[2] In his brief, defendant appears to say the factor which triggers the allotment of the capital case is the date of the arraignment. However, our review of the testimony and the applicable court rules reveals it is the return of the indictment, not the date of the arraignment, which is the triggering factor.
[3] The Third Circuit Court of Appeal has also applied a harmless error analysis in similar situations involving an allotment under an unconstitutional system. See State v. Larson, 579 So.2d 1050 (La.App. 3d Cir.), writ denied, 588 So.2d 1110 (La.1991); State v. Montgomery, 575 So.2d 471 (La.App. 3d Cir.1991); State v. Kimmel, 571 So.2d 208 (La.App. 3d Cir.1990); State v. Romero, 552 So.2d 45 (La.App. 3d Cir.1989), writ denied, 559 So.2d 137 (La.1990).