600 So.2d 875 (1992)
STATE of Louisiana
v.
Isiah JONES, Jr.
No. KA 91 0441.
Court of Appeal of Louisiana, First Circuit.
May 22, 1992.
*876 Allen J. Myles, Asst. Dist. Atty., Plaquemine, for State.
Tom Nelson, New Roads, for defendant.
Before LOTTINGER, EDWARDS and GONZALES, JJ.
EDWARDS, Judge.
Isiah Jones, Jr., was charged with second degree murder, a violation of La.R.S. 14:30.1. He pled not guilty and, after a jury trial, was found guilty as charged. He was sentenced to life imprisonment at hard labor, without benefit of parole, probation or suspension of sentence. He now appeals, urging eight assignments of error as follows:
1. The trial court erred when it allowed the prosecutor to impeach his own witness, Terry James.
2. The trial court erred when it refused to grant defendant's Motion for Mistrial on the ground that the method in which cases are allotted in the 18th Judicial District is unconstitutional.
3. The trial court erred in allowing testimony regarding the autopsy of the victim.
4. The trial court erred when it permitted the prosecutor to introduce photographs of the victim.
5. The trial court erred when it permitted Officer Napoleon Dotson to read defendant's statement to the jury.
6. The trial court erred in sustaining the prosecutor's objection regarding Officer Napoleon Dotson's testimony about the victim's criminal record.
7. The trial court erred in not granting defendant's motion for new trial.
8. The trial court erred in not granting defendant's motion for a post-verdict judgment of acquittal or, alternatively, rendering a judgment modifying the verdict and rendering a judgment of conviction on the lesser included responsive offense of manslaughter.
Assignments of error numbers 1, 3, 4, 5, and 6 were not briefed and, therefore, are considered abandoned. See Rule 2-12.4, Uniform Rules-Courts of Appeal.

FACTS
At about 4:00 a.m., on September 12, 1988, police officers were dispatched to the home of Geraldine Jones, defendant's mother, who had called to report that someone had broken into her home. Officers arrived there and interviewed Mrs. Jones, who gave an oral statement that a man had broken into her house and that she had fought with the man. At about the same time, police received a call that a man had been stabbed and was located a short distance from the Jones' residence. This man, Louis Tillman, Jr. (the victim), was the man who had entered Mrs. Jones' home. The victim had been stabbed three times and, subsequently, died. Defendant was arrested for murder.
At the trial, Terry James, defendant's girlfriend, testified that about 1 a.m. she and defendant were in their bedroom when they heard someone calling defendant's *877 name. After defendant left the room, Ms. James heard defendant struggling with someone. Ms. James then heard Arthur Jones (Mrs. Jones' boyfriend) and Mrs. Jones leave their bedroom and enter the kitchen. Ms. James also went into the kitchen, where she saw Arthur Jones, Mrs. Jones, defendant, and the victim, who was running out of the house. Ms. James saw blood on the floor, on defendant and on Arthur Jones. She further testified that defendant told her that he had stabbed the victim. Ms. James recalled that defendant was bruised and red on the night of the stabbing from being hit by the victim.
In her trial testimony, Ms. James admitted giving two prior statements to police, one on the day of the incident and another statement two months later. Ms. James admitted that she related different versions of the incident in her statements to the police. In the first statement, she said that Arthur Jones, Mrs. Jones, and defendant were struggling with the victim, but did not say who stabbed the victim. The second statement was as follows: Ms. James stated that she and defendant entered the living room when they heard voices. There, she saw Arthur Jones and Geraldine Jones speaking to the victim. In response to the conversation, defendant stated that he did not have the victim's money. Defendant left the room, and the victim followed him into the kitchen. Ms. James also left the living room and returned to the bedroom. After hearing a struggle in the kitchen, Mrs. James went to the kitchen. She saw Arthur Jones and Mrs. Jones struggling with the victim. The defendant, she said, was standing off to the side near the stove. She saw blood on the floor and the victim running out of the door. She also saw a knife in Arthur Jones' hand. Arthur Jones told the others to "just say that he [the victim] broke in ... for some money...." Mrs. Jones told defendant to say "nothing, that she would say she did it."
Officer Donald Ray Spradley, Sr., of the Plaquemine Police Department, testified that he investigated the complaint at the Jones' residence. On the night of the incident, Mrs. Jones stated that the victim broke into her house and she stabbed him. Officer Spradley did not observe any bruises or marks on Mrs. Jones. He also saw defendant come out of the bedroom and did not see any bruises on defendant.
Detective Napoleon Dotson, of the Plaquemine Police Department, testified that there were no signs of forced entry into the home, nor did he see any visible bruises on either Mrs. Jones or defendant on the night of the incident.
At the trial, Mrs. Jones testified that she had given two statements to police after the stabbing. In her first statement, Mrs. Jones stated that she, not defendant, had stabbed the victim during a struggle in her kitchen. In that statement, she said that during the night she left her bedroom when she heard someone kicking her door. When she entered the kitchen, she saw the victim and he started fighting with her. Mrs. Jones grabbed a knife off the counter and stabbed the victim twice. When defendant and his girlfriend came out of their bedroom, the victim ran from the house. Mrs. Jones then called the police.
In her second statement, Mrs. Jones stated that she was in her bedroom when she heard a loud noise. When she entered the kitchen, she saw defendant fighting with the victim and heard the victim yell, "get the knife." She tried to stop the fight, and the victim grabbed her by the throat. After a struggle, the victim ran out of the house. Mrs. Jones turned on the kitchen lights and discovered blood and a knife on the floor. Mrs. Jones and defendant were covered with blood, but realized that neither of them was cut. After mopping up the blood on the floor, she called the police.
However, during the trial, Mrs. Jones related a third version of the incident. She stated that at about 11:30 p.m., a few hours before the stabbing, the victim knocked on her door, asked for defendant, and stated that defendant owed him some money. Mrs. Jones told him that defendant was not at home. After some disagreement as to whether or not the victim could wait on Mrs. Jones' porch, the victim stated that he would wait at the corner and that he was *878 going to "kill him (defendant) when I see him." Then Mrs. Jones asked him to come in to discuss the matter. She offered to give the victim the money if he agreed to leave her son alone. The victim agreed. He accepted the money and apologized to Mrs. Jones for his behavior. Later, when defendant came home, Mrs. Jones confronted him about owing money to the victim. Mrs. Jones also told defendant that the victim had threatened him and that she had paid the victim.
Later that night, Mrs. Jones came out of her bedroom and saw the victim, whom she later recognized as the man who had been looking for her son. They struggled; and defendant, hearing the noise, came out of his bedroom. Mrs. Jones was pushed against a wall, and the victim lunged after defendant. They fought, and the victim began hitting and beating defendant. She screamed for Arthur Jones, who came into the kitchen and broke up the fight. Seeing the blood, she checked to see if either she or defendant was bleeding. Neither was cut. She further admitted that the first statement was false and that she gave it because she was trying to protect her son.
In his testimony, defendant stated that he had seen the victim earlier on the evening of the stabbing. The victim asked defendant to obtain some cocaine for him, and defendant answered that he did not know if he could do so. Then defendant went to a lounge until approximately 2:30 a.m., when he returned home. On the way home, he again saw the victim who stated that he had been to defendant's mother's home. Once defendant returned home, defendant's mother told him of the threat that the victim had made against him. Defendant went to bed and later heard someone calling his name. He got up and saw his mother and the victim struggling in the kitchen. The victim pushed his mother away and lunged after defendant. Defendant was continuously beaten by the victim, who was holding defendant with one hand and striking him with the other hand. As to visible injuries, defendant stated that he had a "hickey" on his forehead as a result of the fight. Defendant also stated that he had previously heard that the victim had been convicted of a violent act upon a person and that he had been sent to an anger management clinic.
Defendant admitted that he gave conflicting statements to police on the day of the incident. In his first statement, defendant stated that he was with his girlfriend in their bedroom when he heard voices in the kitchen. He went into the kitchen and saw the victim holding defendant's mother around the neck. The victim was bleeding. When he tried to intervene between the victim and his mother, the victim left the house. In a later statement, the defendant stated that when he found the victim struggling with his mother, defendant stabbed the victim twice with a knife that had been laying on the kitchen counter.
Furthermore, as to whether or not the victim actually broke into the house that night, the testimony of Mrs. Jones, Terry James, and defendant was that the door of the house had a window pane that previously had been broken and that anyone could reach through the missing pane and open the door without a key.

ALLOTMENT
By assignment of error number two, defendant contends that the trial court erred in not granting his motion for mistrial. His motion for mistrial was based upon a ruling that the 18th Judicial District Court's allotment system for criminal cases, under which his case was allotted for trial, was unconstitutional.
On the second day of trial, defendant made a motion for mistrial, arguing that Judge Marionneaux of the 18th Judicial District Court had issued, on the day before, a ruling which held that, based upon State v. Simpson, 551 So.2d 1303 (La. 1989), the criminal case allotment system of the 18th Judicial District violated due process. The trial court denied the motion. Defendant did not apply for supervisory writs to contest this ruling.
In State v. Simpson, the Louisiana Supreme Court held that the 15th Judicial District Court criminal case allotment system violated due process. Simpson, 551 *879 So.2d at 1304-05. Based upon the Simpson decision, this court found in State v. Gomez, 573 So.2d 521 (La.App. 1st Cir. 1990), that the criminal case allotment method in the 18th Judicial District then in use did not comply with the mandate that the allocation be random and that it not be selected by the state. The instant case was allotted under the same system found unconstitutional in State v. Gomez. Accordingly, we find the method by which this proceeding was allotted also violated defendant's constitutional right to due process.
Having found that the case allotment system violated due process, we must now inquire whether or not this violation warrants a reversal of defendant's conviction. We note that defendant has not, either at trial or in his brief before this court, argued that prejudice occurred as a result of the allotment of this case. Nor does the record reveal any actual prejudice to defendant. For the reasons which follow, we conclude that the assignment of defendant's trial under this unconstitutional allotment system is at most harmless error.
The harmless error analysis was discussed at length in State v. Cage, 583 So.2d 1125, 1127 (La.), cert. denied, ___ U.S. ___, 112 S.Ct. 211, 116 L.Ed.2d 170 (1991). The error in the case sub judice does not fall squarely within the framework laid out by the Louisiana Supreme Court in Cage. However, we note that the Louisiana Supreme Court also has applied a harmless error analysis to a situation in which an indictment is insufficient, despite its recognition that "the foundation of a criminal prosecution is a valid indictment." State v. James, 305 So.2d 514, 516 (La.1974). We followed this line of reasoning in State v. Barclay, 591 So.2d 1178 (La.App. 1st Cir. 1991), writ denied, 595 So.2d 653 (La.1992). The James and Barclay opinions did not use an overly technical application of the guidelines to determine the situations in which a harmless error analysis could be applied, but rather used a reasonable and practical evaluation of whether the defendant had been prejudiced by the error.
The issue in both James and Barclay concerned a defective indictment. See Barclay, 591 So.2d at 1181, n. 3. Both opinions applied a harmless error analysis and determined that the essential purpose of an indictment, notice to the accused of the charge, had been served and that the defendant had not been prejudiced. Herein, we apply a similar analysis. The basic purpose of a random allotment system is to assure that the accused is tried before an impartial judge. Defendant herein does not even allege that the trial judge to whom the case was allotted was biased in any manner. Therefore, we find no prejudice accrued to the defendant due to the error in the allotment system and, thus, find the error was harmless. This conclusion is strengthened by the particular facts of this case, which was originally allotted to Judge Kimball, but which, due to her illness, was reassigned to ad hoc Judge Landry. Therefore, this assignment of error lacks merit.[1]

SUFFICIENCY OF EVIDENCE
In assignment of error numbers seven and eight, defendant contends that the trial court erred in not granting his motions for new trial and post-judgment verdict of acquittal. In both motions, he raises an issue of sufficiency of the evidence. He contends that either there was insufficient evidence to support his conviction for second degree murder or, alternatively, that there was only sufficient evidence to convict him of the lesser included offense. Defendant specifically argues that the homicide was committed in self-defense and, alternatively, that the evidence warranted only a conviction of manslaughter.
In a homicide prosecution, when defendant claims self-defense, the state must prove beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Garcia, 483 So.2d 953, 956 *880 (La.1986); State v. Clark, 558 So.2d 665, 672 (La.App. 1st Cir.), writ denied, 564 So.2d 317 (La.1990). A homicide is justifiable only "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger...." La.R.S. 14:20(1).
For appellate purposes, the standard of review of a claim of self-defense is whether or not a rational trier of fact, after viewing the evidence in the light most favorable to the prosecution, could find beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Matthews, 464 So.2d 298, 299 (La.1985). This court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. State v. Johnson, 553 So.2d 865, 872 (La. 1st Cir.1989), writ denied, 558 So.2d 600 (La.1990).
Herein, the evidence establishes that the victim was unarmed when he began fighting with defendant and defendant's mother, that no bruises or injuries were visible on defendant or his mother by the police officers who investigated the homicide shortly after the fight and stabbing, and that there were numerous versions of the stabbing incident related by defendant, his mother, and his girlfriend. Obviously, the jury chose not to find that the stabbing was committed in self-defense or in the heat of passion required for a finding of manslaughter. Viewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found beyond a reasonable doubt that defendant was guilty of second degree murder. This assignment of error lacks merit.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] Our brethren of the Third Circuit have also applied a harmless error analysis in a similar situation involving an unconstitutional allotment system. See State v. Montgomery, 575 So.2d 471, 477-78 (La.App. 3rd Cir.1991).