862 So.2d 420 (2003)
STATE of Louisiana, Appellee,
v.
Clifton M. FIELDING, Appellant.
No. 37,943-KA.
Court of Appeal of Louisiana, Second Circuit.
December 10, 2003.
*423 Louisiana Appellate Project by Peggy J. Sullivan, Monroe, for Appellant.
Walter E. May, Jr., District Attorney, for Appellee.
Before WILLIAMS, GASKINS & PEATROSS, JJ.
PEATROSS, J.
Defendant, Clifton M. Fielding, was convicted by a unanimous jury of second degree murder, a violation of La. R.S. 14:30.1. He was sentenced to the mandatory term of life imprisonment in accordance with La. R.S. 14:30.1(B). Defendant now appeals, assigning four errors. For the reasons stated herein, Defendant's conviction and sentence are affirmed.

FACTS
On October 19, 1999, at 11:24 p.m., 911 dispatchers received a call that someone had been shot in the area of Ivy and Howard streets, an area known as West Town, in Arcadia, Louisiana. The Arcadia Police Department and the Bienville Parish Sheriff's Office responded with several officers, as well as emergency medical personnel, dispatched to the scene. The first officer to arrive at the scene was Arcadia police officer, Andrea Rogers. Officer Rogers testified that, when he arrived, there was a small red pickup truck in the middle of the road with the driver's side door open. A white male was lying in the road outside of the open door with an apparent gunshot wound to the head which was bleeding profusely. A loaded .38 Smith and Wesson pistol was found near the victim's feet.
Officer Randy Price arrived shortly thereafter. Officer Price testified that no one was in the area when he arrived, but that a few people eventually started coming out of nearby houses. He secured the scene and no one but law enforcement personnel were allowed within 12 to 15 feet of the body and truck. Two deputies from the Bienville Parish Sheriff's Department arrived next, followed by emergency medical personnel. Officer Rogers testified that the medical personnel moved the victim's body slightly to determine whether the man had a heartbeat; but, after determining that the man was dead, the medical personnel left the body in the same position as the officer had found it. Numerous other officers then arrived at the scene and Officer Price took photographs of the crime scene and gathered physical evidence.
A search of the truck revealed that the glove compartment was open, the driver's side window was down and there was a small splatter of blood on the inside of the driver's door. There were no signs that a struggle had occurred inside the truck. Two spent .38 caliber cartridge casings were found in the truck, one on the driver's seat and the other amid jumper cables that were coiled on the passenger side floorboard. Officers found a wallet in the victim's back pants pocket, which revealed his identity as that of a Gary Stephens. There was no money in the wallet.
Investigators interviewed residents of the immediate area where the shooting *424 occurred. Several residents reported hearing two (or three) gunshots in rapid succession. Although some stated they had looked outside as soon as they had heard the gunshots, all denied seeing anybody in the area after the shooting.
It was determined that the victim, Mr. Stephens, worked in the Arcadia area as a permitter[1] for an oil exploration company and was familiar with the area where his body was found. Prior to the shooting, Mr. Stephens had been at a local bar where he had consumed a couple of drinks and cashed a check before telling an employee of the bar that he was going to fill up his truck with gas and go to the hotel where he was staying to get some sleep. The employee of the bar testified that, after paying for his drinks and a tip, she gave Mr. Stephens $40 in cash. The employee further testified that she thought Mr. Stephens put the money in his wallet, but it might have been his checkbook. No checkbook was found on Mr. Stephens' person or in the truck.
The investigation of the shooting ultimately led officers to Defendant, who was arrested on an outstanding warrant for shoplifting shortly after the shooting. While in custody, officers questioned Defendant regarding the shooting. In an unrecorded statement, Defendant told a detective that, on the evening of the shooting, he had seen the victim at a convenience store buying gas and that he had gotten in the victim's vehicle and asked for a ride. Defendant stated that the victim did not agree to give him a ride and Defendant then got out of the truck. He further stated that, since he had opened the passenger side door of the victim's truck, officers would find his fingerprints there.
The officers also learned during the investigation that Defendant was unemployed and was either living with friends or in abandoned houses in the area where the shooting took place. A friend of Defendant, Jacqueline Baxter, told officers that Defendant had been at her house before and after the shooting. She further divulged that he had a pistol in a black backpack that could possibly be found in one of the abandoned houses nearby.
The authorities began a search of the abandoned houses in the area and, in the second house searched, found a .38 Lorcin pistol partially hidden between the cushion and back of a recliner. Officers subsequently questioned Defendant a second time, informing him that the Lorcin pistol had been found. Defendant then told the officers to "get a recorder." After being read his Miranda rights warning and signing a waiver of rights form, Defendant related to the officers an account of the events leading up to the shooting that substantially differed from his prior statement. In this second statement, Defendant claimed that he was walking down the road when Mr. Stephens and a passenger drove past him in the truck, turned and came back by him. He asserted that Mr. Stephens stopped him and asked him whether or not he sold drugs. He stated that, when he answered he did not sell drugs, the passenger in the truck raised a gun. Defendant asserted that he was standing on the driver's side of the vehicle by the front fender when Mr. Stephens attempted to get out of the vehicle and asked him whether or not he knew where he could get some drugs. He said he again answered "no." According to Defendant, at this point, Mr. Stephens was "about to raise a pistol in his hand" and so *425 he (Defendant) put his hand on his pistol and shot Mr. Stephens in self-defense.
A grand jury returned a bill of indictment charging Defendant with the second degree murder of Mr. Stephens. Defendant filed a motion to suppress the statements and the pistol. The defense argued that the statements were coerced and that there was no search warrant sought or issued for the search of the abandoned house where the pistol was found. The trial judge denied the motion, finding that the statements were made freely and voluntarily and that Defendant did not have a right to an expectation of privacy over the abandoned house which was property belonging to another.[2]
At trial, five officers, three residents of West Town, four friends of Defendant, the bar employee, Mr. Stephens' boss and three experts testified for the State. The evidence established that there had been no tampering with the crime scene, that the spent cartridge casings found inside the truck were fired from the .38 Lorcin pistol found in the abandoned house and that Mr. Stephens was shot twiceone shot entering under his right armpit and traveling just under the skin of the upper back and the other from very close range to the right side of the head in the area of the temple. Coroner George McCormick testified that the cause of death was the gunshot wound to the head. As previously stated, two .38 cartridge casings were found in the truck. The Lorcin pistol was found with four rounds unfired in the clip that holds six rounds. DNA analysis of tissue taken from the Lorcin pistol was established to match that of Mr. Stephens. There was no evidence that there was, in fact, a passenger in the truck at the time of the shooting. The audio tape of Defendant's second statement was played for the jury.
The defense moved for a mistrial when the district attorney asked Dr. McCormick if the gunshot wound to the head was the result of an "execution or assassin type killing." The trial court immediately admonished the jury and did so again after hearing and denying the motion for mistrial.
The defense presented no evidence. The jury unanimously found Defendant guilty of second degree murder and he was subsequently sentenced to life imprisonment. A motion to reconsider sentence was filed and denied. This appeal ensued.

DISCUSSION
Assignment of Error Number One: There was insufficient evidence at trial to support the verdict of second degree murder.
The standard for reviewing a claim of insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Rosiere, 488 So.2d 965 (La.1986). The reviewing court is to consider the record as a whole and not just the evidence most favorable to the prosecution; and, if rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld. State v. Mussall, 523 So.2d 1305 (La.1988).
In Defendant's second statement, he admits that he shot Mr. Stephens, but claims that he was acting in self-defense.
*426 In State v. Murray, 36,137 (La.App.2d Cir.8/29/02), 827 So.2d 488, writ denied, 02-2634 (La.9/5/03), 852 So.2d 1020, this court reiterated its holding in State v. Hudson, 33,357 (La.App.2d Cir.5/10/00), 760 So.2d 591, that sets forth the law applicable to a claim of justifiable homicide because of self-defense:
Self-defense is justification for a killing only if the person committing the homicide reasonably believes he is in imminent danger of losing his life or receiving great bodily harm and that deadly force is necessary to save his life. La. R.S. 14:20(1); State v. Cotton, 25,940 (La.App.2d Cir.3/30/94), 634 So.2d 937; State v. Jones, 600 So.2d 875 (La.App. 1st Cir.1992), writ denied, 92-2351 (La.5/12/95), 654 So.2d 346. The state has the affirmative duty of proving beyond a reasonable doubt that the killing was not in self-defense. State v. Arnold, 30,282 (La.App.2d Cir.1/21/98), 706 So.2d 578.
For a homicide to be justified, the offender must have had a reasonable belief he was in imminent danger of losing his life or receiving great bodily harm and that the killing was necessary, under the circumstances, to save himself from that danger. La. R.S. 14:20(1); State v. Dozier, 553 So.2d 911 (La.App. 4th Cir.1989), writ denied, 558 So.2d 568 (La.1990).
Factors to consider in determining whether a defendant had a reasonable belief the killing was necessary are the excitement and confusion of the situation, the possibility of using force or violence short of killing and the defendant's knowledge of the assailant's bad character. State v. Hardeman, 467 So.2d 1163 (La. App. 2d Cir.1985). Although there is no unqualified duty to retreat, the possibility of escape is a factor to consider in determining whether a defendant had a reasonable belief that the use of deadly force was necessary to avoid the danger. State v. Brown, 414 So.2d 726 (La.1982).
When a defendant in a homicide case claims self-defense, the State has the burden of establishing beyond a reasonable doubt that the defendant did not act in self-defense. State v. Garcia, 483 So.2d 953 (La.1986); State v. Flowers, 574 So.2d 448 (La.App. 2d Cir.1991), writ denied, 580 So.2d 666 (La.1991).
Second degree murder is defined in La. R.S. 14:30.1 as:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2)(a) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, drive-by shooting, armed robbery, first degree robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm.
Defendant argues that, because a loaded gun was found beside the victim's body and in light of his statement that he shot Mr. Stephens after Mr. Stephens began to raise a gun, the State did not prove beyond a reasonable doubt that he was not acting in self-defense. The State argues that the physical evidence is inconsistent with Defendant's second version of the events leading up to the shooting.
The only accounts of the events surrounding the shooting come from Defendant's two statements to the investigating officers. In the first, unrecorded statement, Defendant denied any knowledge of or involvement in the shooting. He offered only that he had approached Mr. Stephens' truck, sat in the passenger's *427 seat and asked for a ride to West Town. After being told that Mr. Stephens was not going to West Town, Defendant got out of the truck and did not see Mr. Stephens again that night. Once Defendant was made aware of the recovery of the Lorcin pistol, however, his story changed. In his second statement, which was recorded and played for the jury, he depicted a much different scene as he explained that Mr. Stephens and a passenger approached him wanting to buy drugs. Defendant then stated that he did not sell drugs and he noticed that the passenger had a gun. Mr. Stephens then exited the truck and asked about purchasing drugs again and began to raise a gun to Defendant. According to Defendant, he then put his hand on his pistol and shot once aiming at Mr. Stephens' head and shot again, unsure of where he was aiming with the second shot. Defendant stated that he ran away and hid the gun in a recliner in the abandoned house.
Significantly, Defendant also stated that he was standing on the driver's side of the truck toward the front fender, at least five to six feet away from Mr. Stephens, when he shot him. The transcript of the statement played at trial reads:
"... And at that time I saw him about to raise a pistol in his hand.
Q Was the driver out of the vehicle at that time?
A Yes. He was out of the vehicle.
Q Did he have his door open?
A The door was open.
Q Lights on?
A Right.
Q Engine still running?
A Yes.
Q All right.
A And I put my hand on the pistol that I was carrying at the time.
* * *
Q And your pistol was where? In your waistband, in the back of your waistband?
A Yes. I put my hand on my pistol and I saw him attempt to raise his gun so I shot.
Q You shot which person?
A The driver.
Q How close to the driver were you?
A At least within five-six feet away.
Q You shot at the driver? What part of the driver were you shooting at?
A The pistol-I had the pistol aimed at his head.
Q And you shot one time?
A Twice.
Q The first time you shot shooting at his head and then the second time you fired, where was he at?
A I really don't know because when I fired the first time, I attempted to turn my head. Scared you know and I just fired again, not looking at what I was doing.
Q Where was the passenger of the truck at, at that time?
A He was still in the vehicle.
Q Did he have his gun in his hand getting out?
A No.
Q What was the passenger doing?
A I really wasn't paying attention to what he was doing. I was just worried about the-they had a gun you know
The physical evidence contradicts this scenario. Firearms expert, Richard Beighley, testified that the two spent cartridge casings were fired from the .38 Lorcin pistol that was found in the abandoned house. These cartridge casings were found inside the truck, one in the driver's seat and one on the passenger side floor board, not *428 outside where Defendant argues he was standing when he fired the shots. Other testimony established that the cartridge casings would eject from the right side of the Lorcin pistol when fired. This supports the State's suggested scenario that Defendant was inside the truck on the passenger side when he shot Mr. Stephens and the cartridge cases ejected first onto the seat and then to the right onto the passenger side floor.
Further compelling evidence that this shooting was not in self-defense is testimony of Dr. McCormick and Mr. Beighley establishing that Mr. Stephens was shot at such a close range that his blood and tissue were found on the Lorcin pistol. Mr. Beighley testified that the tearing of Mr. Stephens' shirt and the concentration of soot and partially burned and unburned gunpowder were consistent with close contact shots, with the gun being no more than six inches from the skin. Further, Mr. Beighley testified that, without testing, his visual assessment of the shirt convinced him that it was a close contact shot. Dr. McCormick corroborated this testimony, opining that the gun had been pressed against Mr. Stephens' skin resulting in blood and tissue splattering onto the gun. Finally, Michelle Collins, an expert in the field of DNA analysis, testified that "to a certain probability in this case 1 in 6.4 trillion the ... DNA profile from the firearm was consistent with ... the DNA profile from the blood from Gary Stephens."
The State submits that the foregoing evidence was sufficient for a rational jury to find that Defendant had the specific intent to kill or inflict great bodily harm when he aimed the gun at Mr. Stephens' head and pulled the trigger. We agree. Numerous cases hold that specific intent is a state of mind and need not be proved as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126 (La.1982); State v. Fuller, 414 So.2d 306 (La.1982); State v. Doby, 540 So.2d 1008 (La.App. 2d Cir.1989), writ denied, 544 So.2d 398 (La.1989). Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act. La. R.S. 14:10(1); State v. Lindsey, 543 So.2d 886 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990); State v. McCray, 621 So.2d 94 (La.App. 2d Cir.1993).2 Pointing a gun at the victim and firing a gun has been ruled sufficient evidence to infer specific intent to kill or do great bodily harm in State v. Procell, 365 So.2d 484 (La.1978), cert. denied, 441 U.S. 944, 99 S.Ct. 2164, 60 L.Ed.2d 1046 (1979), and in State v. Maxey, 527 So.2d 551 (La.App. 3d Cir.1988), writ denied, 541 So.2d 868 (La.1989).
On this record, we find that the testimony and physical evidence were sufficient for a rational jury to find that Defendant had the specific intent to kill or inflict great bodily harm when he fired his weapon at Mr. Stephens' head. Although Defendant's self-serving statement was that he shot the victim in self-defense, the jury obviously chose to reject this version of the shooting. This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson, and does not extend to credibility determinations made by the trier of fact. State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984).
Even if the jury had accepted Defendant's version of the shooting, we fail to see how and at what point under Defendant's scenario he was in imminent danger. Defendant stated that Mr. Stephens did not have the gun in his hand when he was getting out of the vehicle, but "I put my *429 hand on my pistol and I saw him attempt to raise his gun so I shot." In addition, as previously mentioned, Defendant's statement that a passenger was present is also suspect. There was no evidence revealed that such passenger existed; and, even assuming arguendo that a passenger was present, a close reading of Defendant's statement reveals that the passenger and driver had only one gun between them; Defendant stated: "they had a gun you know." Most significantly, Defendant's self-defense scenario does not clearly indicate that either the victim or the alleged passenger ever actually pointed a weapon at Defendant or threatened him. Finally, Defendant fails to explain why it was necessary to deliver a fatal gunshot to the head to protect himself. Defendant's assertion that the State failed to prove that he did not act in self-defense is without merit.
Since we find sufficient evidence to convict Defendant of second degree murder under La. R.S. 14:30.1(A)(1), we pretermit any discussion of Defendant's arguments challenging the State's proof of the shooting during an armed robbery under section (A)(2)(a) of the statute.
Assignment of Error Number Two: The trial court erred in refusing to suppress the physical evidence and the statement made by Clifton Fielding on October 23rd.
In this assignment of error, Defendant argues that the intrusion into the abandoned house where the Lorcin pistol was found was unlawful since there was no search warrant sought or issued. He seeks to have the pistol found as a result of the warrantless search and the resulting statement in which he admitted shooting Mr. Stephens suppressed as tainted evidence.
The State argues that the officers were properly investigating the case by searching the abandoned houses and, further, that the owner of the abandoned house where the pistol was recovered had previously requested that they watch the house and keep people out of the house.
La. Const. art. 1, sec. 5, provides:
Section 5. Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy. No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court.

This court in State v. Taylor, 30,531 (La.App.2d Cir.5/13/98), 714 So.2d 143, held that both the federal and state constitutional provisions protect only reasonable expectations of privacy. We stated:
If there is no reasonable expectation of privacy in the matter sought to be protected, then the constitutional provisions are not applicable. Capital City Press v. East Baton Rouge Parish Metro. Council, 96-1979 (La.7/1/97), 696 So.2d 562; Smith v. Maryland, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). In other words, compliance with the Fourth Amendment and Article 1, § 5, i.e. warrant or exceptions thereto, becomes immaterial.

* * *
The test for determining whether one has a reasonable expectation of privacy which is constitutionally protected "is not only whether the person had an actual or subjective expectation of privacy, but also whether that expectation is *430 of a type which society at large is prepared to recognize as being reasonable." Capital City Press, supra, quoting State v. Harper, 27,278 (La.App.2d Cir.8/23/95), 660 So.2d 537, writ denied, 95-2318 (La.1/12/96), 666 So.2d 320.
Our jurisprudence consistently holds that one does not have a right to an expectation of privacy in property belonging to another. In State v. Kimble, 375 So.2d 924 (La.1979), the supreme court held that two defendants had no right to an expectation of privacy beneath the steps of a vacant trailer where they had hidden drugs. In State v. Henry, 440 So.2d 872 (La.App. 2d Cir.1983), this court, relying on State v. Kimble, supra, held that a defendant had no right to an expectation of privacy in the house of his girlfriend, when he did not own the property and only occasionally stayed there. Likewise, in the later case of State v. Harper, supra, a panel of this court found that a defendant had no expectation of privacy in a neighbor's backyard.[3] Accord State v. Campbell, 93-1959 (La. App. 4th Cir.5/26/94), 640 So.2d 622.
There is no dispute that the deputies conducted a warrantless search of the abandoned house looking for a gun that investigators were told Defendant possessed prior to the shooting and may have hidden in an abandoned house in the area. There is also no dispute that the house was owned by someone other than Defendant, although there was evidence that Defendant sometimes slept in the house without the owner's consent. While the search was also made without the owner's consent, the deputies had been in the house before because the owner had asked them to keep vagrants off the premises.
The trial court denied the motion to suppress, specifically finding that Defendant had no expectation of privacy in the property belonging to another. We find no error in this ruling. Defendant had no right to an expectation of privacy in the abandoned house which did not belong to him.
Probable cause for the search existed from the information given to investigators that the pistol may be found in one of the abandoned houses in the neighborhood. Since the search of the abandoned house was not unlawful, the statement given by Defendant after he learned of the recovery of the gun was not subject to suppression as the product of an illegal search. Defendant's argument to that effect is without merit.
We further agree with the trial court that Defendant's second statement was freely and voluntarily given and was properly admitted by the trial court. A trial court's decision to deny a motion to suppress is afforded great weight and will not be set aside unless the preponderance of the evidence clearly favors suppression. State v. Normandin, 32,927 (La.App.2d Cir.12/22/99), 750 So.2d 321, writ denied, 00-0202 (La.9/29/00), 769 So.2d 550; State v. Williams, 98-1006 (La.App. 5th Cir.3/30/99), 735 So.2d 62, writ denied, 99-1077 (La.9/24/99), 747 So.2d 1118.
This assignment is without merit.
Assignment of Error Number Three: The trial court erred in denying the motion for mistrial made when the prosecutor asked an inappropriate question during direct examination of a witness.
Defendant argues that the trial court erred in failing to grant a mistrial *431 when the district attorney asked Dr. McCormick if the gunshot wounds were "execution or assassin type." The trial judge found the question improper, but found that two admonitions to the jury were sufficient to prevent any prejudice to Defendant.
La.C.Cr.P. articles 770 and 771 address the trial court's authority to declare a mistrial or admonition when an inappropriate comment is made by the district attorney. These articles read:
Art. 770. Prejudicial remarks; basis of mistrial
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
(1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
(3) The failure of the defendant to testify in his own defense; or
(4) The refusal of the judge to direct a verdict.
Art. 771. Admonition
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or

* * *
Art. 775. Mistrial; grounds for
A mistrial may be ordered, and in a jury case the jury dismissed, when:
(1) The defendant consents thereto;
(2) The jury is unable to agree upon a verdict;
(3) There is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law;
(4) The court finds that the defendant does not have the mental capacity to proceed;
(5) It is physically impossible to proceed with the trial in conformity with law; or
(6) False statements of a juror on voir dire prevent a fair trial.
Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.
A mistrial shall be ordered, and in a jury case the jury dismissed, when the state and the defendant jointly move for a mistrial.
In the case sub judice, the alleged inappropriate remark came during the State's questioning of Dr. McCormick:
Q: So this is the type of wound that would be very, very quickly fatal?
A: In a matter of a few seconds, yes, sir.
*432 Q: And could we describe (sic) as an execution or assassination type?
By counsel for defendant: Objection, Your Honor.
By the court:
Sustained. That is going to be stricken from the record. Ladies and Gentlemen, disregard that comment absolutely. Proceed, Mr. D.A.
By counsel for the defendant:
Your Honor, I'm going to ask that the Jury be removed.

* * *
By counsel for the defendant:
Your Honor, at this point I'm going to ask for a mistrial. There is no way an admonition will ever cure what he just said.
After a hearing on the motion for a mistrial, the trial court found that the question was improper, but that an admonition would suffice. We find no error in this conclusion.
The jury had already heard Defendant's recorded statement that he had aimed at Mr. Stephens' head and shot and testimony regarding the position of the body and had viewed photographs of the wound and other crime scene evidence. The trial court reasoned that the remark was made after much evidence was presented regarding the manner in which Mr. Stephens was shot; and, therefore, the impact of the statement was lessened. We note also that, in addition to the admonition, the trial court ordered that no more demonstrative evidence would be allowed, there would be no reenactment of the shooting and there would be no more mention of "assassin-type" killing or executions. The trial court further advised the district attorney that, in addition to the granting of a mistrial if such occurred, he would be found to be in direct contempt of court.
The determination as to whether a remark has resulted in denying a defendant a fair trial is within the sound discretion of the trial court, and a denial of a motion for mistrial will not be disturbed on appeal absent an abuse of that discretion. State v. Smith, 418 So.2d 515 (La.1982); State v. Bean, 582 So.2d 947 (La.App. 2d Cir.1991), writ denied, 586 So.2d 567 (La. 1991); State v. Matthews, 552 So.2d 590 (La.App. 2d Cir.1989), writ denied, 559 So.2d 137 (La.1990). In State v. Griffin, 618 So.2d 680 (La.App. 2d Cir.1993), writ denied, 625 So.2d 1063 (La.1993), this court stated that the prosecution's characterization of the defendant as an "assassin" twice during cross-examination of the defense witness was at best a non-prejudicial error since the trial court had instructed the jury to disregard use of the term and evidence of the defendant's guilt was overwhelming. In the present case, Defendant has failed to articulate how the lesser action of an admonition in lieu of declaring a mistrial deprived him of a fair trial. Based on the record before us, we find that the trial court did not abuse its discretion in allowing the trial to continue with its strong admonition.
Assignment of Error Number Four: The trial court erred in imposing a sentence that was harsh and excessive under the facts and circumstances of this case.
Defendant argues the statutorily mandated life sentence was harsh and unconstitutionally excessive and that the trial court did not articulate its reasons as required by La.C.Cr.P. art. 894.1. We find no merit in this assignment of error.
The sentence for second degree murder is found in La. R.S. 14:30.1(B) which reads:
Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit *433 of parole, probation, or suspension of sentence.
When there is a constitutional mandatory sentence, there is no need for the trial court to justify, under article 894.1, a sentence it is legally required to impose. State v. Koon, 31,177 (La.App.2d Cir.2/24/99), 730 So.2d 503; State v. Rose, 606 So.2d 845 (La.App. 2d Cir.1992).
As to the alleged excessiveness of the mandatory prison term, it is within the legislature's purview to determine the length of the sentence imposed for crimes classified as felonies and the courts are charged with applying those punishments unless they are found to be unconstitutional. State v. Koon, supra. The decision to assess mandatory life sentences for certain felonies is within the prerogative of the legislature. Id. Further, the argument that the mandatory life sentence for second degree murder is a violation of the prohibition against excessive punishment in the Louisiana Constitution has been repeatedly rejected. State v. Parker, 416 So.2d 545 (La.1982); State v. Brooks, 350 So.2d 1174 (La.1977); State v. Davis, 31,711 (La.App.2d Cir.3/31/99), 732 So.2d 612, writ denied, 99-3114 (La.5/5/00), 761 So.2d 539.
In the case sub judice, Defendant fails to articulate why his circumstances justify an exception to the imposition of the mandatory sentence. In order to overcome the legislative mandate, there must be clear and convincing evidence that Defendant is exceptional or that, because of unusual circumstances, he is the victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense and the circumstances of the case. State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672. We find no such unusual circumstances in this case; and, on the evidence presented, we find that imposition of the mandatory life sentence does not shock the sense of justice. State v. Dorthey, 623 So.2d 1276 (La.1993).
This assignment lacks merit.

CONCLUSION
For the foregoing reasons, the conviction and sentence of Clifton M. Fielding are affirmed.
AFFIRMED.
NOTES
[1] A permitter contacts local landowners on whose property the company seeks to conduct testing. It is the permitter's responsibility to seek approval from the landowner for the company to lay cable and conduct dynamite testing for oil exploration.
[2] On the day of trial, another inculpatory statement to a probation officer was suppressed after the trial court determined that it was taken after Defendant was arrested and his right to counsel had attached.
[3] In Harper, supra, this court went further to state that "[w]hen property has been abandoned, a person's property interest in it lapses, and there is no further reasonable expectation of privacy, so property may be searched and seized without normally requiring a search warrant."