940 So.2d 100 (2006)
STATE of Louisiana, Appellee
v.
James BROWN, Appellant.
No. 41,386-KA.
Court of Appeal of Louisiana, Second Circuit.
September 20, 2006.
*101 Louisiana Appellate Project, by: Carey J. Ellis, III, for Appellant.
Jerry L. Jones, District Attorney, George D. Ross, Assistant District Attorney, for Appellee.
Before WILLIAMS, PEATROSS & LOLLEY, JJ.
PEATROSS, J.
Defendant, James Brown, appeals from a conviction of second degree murder in violation of La. R.S. 14:30.1. He was sentenced to life in prison at hard labor without benefit of probation, parole or suspension of sentence. On appeal, Defendant challenges only the sufficiency of the evidence to support the conviction. For the reasons set forth herein, Defendant's conviction is affirmed.

FACTS
On June 27, 2004, as occurred most every Friday, Saturday and Sunday, the residents of Monroe's Fontana Alley were playing cards, dominos and dice while drinking. Fontana Alley is a dirt road with 12-15 "shot gun" style houses. On that Sunday evening, Defendant was sitting on a neighbor's porch after he had been drinking for several hours when he was approached by his good friend, Ronnie Walker. Without apparent provocation, Mr. Walker pulled Defendant from the porch, threw him to the ground and began beating him. As he beat Defendant, Mr. Walker accused Defendant of sleeping with his wife.
According to Defendant, Verna Walker, Ronnie Walker's wife, broke up the fight and then walked away. Defendant attempted to leave the area when Mr. Walker said, "[I]t ain't over," and began to choke and beat him again. At some point during the struggle, Defendant pulled out a gun and shot Mr. Walker once in the chest. Mr. Walker died from the resulting injury. Defendant then walked to his home, where he was later arrested. During a police interview on the night of the shooting, Defendant told police he shot his best friend.
The State presented a different version of events, mainly through the testimony of Milton Pittman, who witnessed the altercation and shooting. According to his testimony, Mr. Walker threw Defendant off the porch and straddled him on the ground, accusing Defendant of sleeping with his wife. The two then got up and walked over to a fence and back, just talking. Defendant then drew his gun and fired. At the time of the shooting, Mr. Pittman did not see Mr. Walker fighting or choking Defendant and could not hear the conversation between the two men.
At his jury trial, Defendant argued that the shooting was justified on the ground of self-defense. The jury rejected this argument and ultimately returned a verdict of second degree murder. As previously stated, Defendant was sentenced to life in prison at hard labor without benefit of probation, parole or suspension of sentence. He filed, pro se, a motion for post-verdict judgment of acquittal and a motion for new trial. The trial court denied both. This appeal ensued.

DISCUSSION
Assignment of Error Number One (verbatim): The State failed to present *102 sufficient evidence to support the verdict, a conviction of second degree murder.
On appeal, Defendant asserts one assignment of error, that the State failed to present sufficient evidence to support the verdict, a conviction of second degree murder. More specifically, Defendant argues that the State failed to prove that the killing was not justified. If so, the State failed to prove second degree murder beyond a reasonable doubt. This court is limited in its review by the errors assigned and briefed. See Uniform Rules, Courts of Appeal, Rule 2-12.4.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132; State v. Murray, 36,137 (La.App.2d Cir.8/29/02), 827 So.2d 488, writ denied, 02-2634 (La.9/5/03), 852 So.2d 1020. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App.2d Cir.8/30/02), 827 So.2d 508, writ denied, 02-3090 (La.11/14/03), 858 So.2d 422.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, 36,180 (La. App.2d Cir.9/18/02), 828 So.2d 622, writs denied, 02-2595 (La.3/28/03), 840 So.2d 566, and 02-2997 (La. 6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. White, 28,095 (La.App.2d Cir.5/8/96), 674 So.2d 1018, writs denied, 96-1459 (La.11/15/96), 682 So.2d 760, 98-0282 (La.6/26/98), 719 So.2d 1048.
Under La. R.S. 14:30.1, second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. Specific intent is a state of mind and need not be proven as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126 (La.1982); State v. Taylor, 621 So.2d 141 (La.App. 2d Cir.1993), writ denied, 93-2054 (La.2/11/94), 634 So.2d 371. Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1); State v. Lindsey, 543 So.2d 886 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990); State v. McCray, 621 So.2d 94 (La.App. 2d Cir.1993). The determination of whether the requisite intent is present in a criminal case is for the trier of fact. State v. Brown, 618 So.2d 629 (La.App. 2d Cir.1993), writ denied, 624 So.2d 1222 (La.1993). The discharge of a firearm at close range and aimed at a person is indicative of a specific intent to *103 kill or inflict great bodily harm upon that person. State v. Murray, supra.
Self-defense is justification for a killing only if the person committing the homicide reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that deadly force is necessary to save his life. La. R.S. 14:20(1); State v. Cotton, 25,940 (La. App.2d Cir.3/30/94), 634 So.2d 937; State v. Jones, 600 So.2d 875 (La.App. 1st Cir. 1992), writ denied, 92-2351 (La.5/12/95), 654 So.2d 346. The State has the affirmative duty of proving beyond a reasonable doubt that the killing was not in self-defense. State v. Arnold, 30,282 (La. App.2d Cir.1/21/98), 706 So.2d 578.
In the case sub judice, Defendant does not contest the element of specific intent or whether he is guilty of a lesser included offense. Instead, he argues that the State failed to prove beyond a reasonable doubt that he did not act in self-defense. Accordingly, the only question or issue before the court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the State failed to prove beyond a reasonable doubt that the shooting was not in self-defense.
A sufficiency of the evidence review warrants a brief overview of the evidence presented. Several witnesses testified for the State regarding the events of June 27, 2004. Mr. Pittman testified that he was sitting outside visiting with friends in Fontana Alley when he saw Mr. Walker pull Defendant from a porch. "They was talking, then, uh, Mr. Walker grabbed him, pulled him off the porch and throwed [sic] him on the ground and he got straddle of him." Mr. Pittman heard Mr. Walker say to Defendant that he (Defendant) was "going with" Mr. Walker's wife. Backing away from the altercation, Mr. Pittman testified that he watched as the events unfolded.
According to Mr. Pittman, Defendant and Mr. Walker got up from the ground and moved over to a fence and continued to talk; however, Mr. Pittman could not hear the conversation. After a few minutes, Mr. Pittman saw the duo move back to the original spot of the on-the-ground tussle. Mr. Pittman did not see any weapons or either of the parties hitting the other at this time. As the pair was talking, Mr. Pittman saw Defendant turn away from Mr. Walker and pull out a gun.[1] Defendant turned back to Mr. Walker and shot him. Mr. Walker took a few steps and fell. After the shooting, Defendant walked to his house. Mr. Pittman testified that he did not see any blood or injuries on Defendant at the time of the shooting. At trial, Defendant attacked Mr. Pittman's testimony as being clouded by alcohol and emphasized Mr. Pittman's failure to remember other details of that night.
Joanne Ignot,[2] Defendant's girlfriend of 27 years and the mother of his three children, testified for the State. Ms. Ignot was home sleeping when Defendant woke her and said he shot someone and was going to wait for the police on the porch. Entering with Ms. Ignot's permission, the police found the murder weapon on a chair in her house. During her testimony, Ms. Ignot stated that Mr. Walker was bigger, taller and younger than Defendant. She testified that, on the evening of the shooting, Defendant had been drinking and *104 that she had last seen him a couple of hours before the shooting.
Captain Richard (Rick) Jones, head of the crime scene unit for the Monroe Police Department, testified that he went to the scene of the shooting after receiving a call at approximately 10:00 p.m. on June 27, 2005. Captain Jones set up lighting in the area and took pictures, which he identified at trial. Mr. Walker had been transported to St. Francis Hospital. At the hospital, Captain Jones took pictures of Mr. Walker and retrieved evidence, including a closed pocket knife taken from Mr. Walker's rear pants pocket.
Detective Arthur Graves of the Monroe Police Department attempted to interview Defendant on the night of the murder. After having Defendant complete a waiver of rights form, Detective Graves asked Defendant several questions in an attempt to determine his sobriety as Defendant smelled of alcohol. Defendant acknowledged that he had been drinking, but stated he had sobered up a lot. Detective Graves discontinued the interview when Defendant became distraught after learning that Mr. Walker had died. Detective Graves testified that he thought Defendant understood his rights, but the questioning was discontinued because Defendant was distraught and intoxicated. Detective Graves did not notice any injuries to Defendant during the interview and Defendant was not taken to the hospital.
Dr. Frank Peretti, a forensic pathologist, performed the autopsy of Mr. Walker. Mr. Walker had a single contact gunshot wound to the left side of his chest. As a result of the gunshot, Mr. Walker bled to death internally. Mr. Walker's blood alcohol level was .148 grams percent.
After the State rested its case, Defendant testified on his own behalf. As described above, Defendant claimed that at the time of the shooting, Mr. Walker was hitting and choking him. He testified that he believed that shooting Mr. Walker was the only way to escape.
Despite the testimony of Mr. Pittman to the contrary, Defendant stated that Mr. Walker's wife broke up the fight and there was never any talking between fights. Defendant acknowledged that he had been drinking during the day, but he did not believe alcohol had clouded his judgment or caused him to overreact. While Defendant knew Mr. Walker to carry a knife, he testified that it was not out during the struggle. In regards to his injuries, Defendant stated that he did not receive any medical treatment, but had two big knots (where the knots were on his body was not identified in the record) and a mark around his throat.
The testimony of Mr. Pittman, however, contradicted that of Defendant on several key aspects of the incident. Mr. Pittman testified that he saw Mr. Walker and Defendant talking after struggling on the ground. Defendant, according to Mr. Pittman, was not in a chokehold at the time he fired the fatal shot. Defendant and Mr. Walker were talking when the shooting occurred. Mr. Pittman watched Defendant remove a gun from his clothing and shoot Mr. Walker in the side.
After viewing the evidence in the light most favorable to the prosecution, we conclude that the State presented sufficient evidence to support Defendant's conviction of second degree murder. Defendant admitted that he shot Mr. Walker once in the chest in an attempt to free himself from what appears to have been a one-handed chokehold. Defendant alleged he did not intend to kill Mr. Walker, but he believed himself to be in a life- or death-struggle with Mr. Walker, and he chose to shoot Mr. Walker to free himself from the choke hold.
*105 The credibility determination made by the jury in favor of Mr. Pittman's testimony should not be disturbed by this court. Mr. Pittman's testimony alone, if believed, is sufficient to establish that Defendant aimed his gun at Mr. Walker and shot him as they stood together talking. At the time, there was no ongoing fight or other action that would cause a reasonable person to believe that he was in imminent danger of losing his life or receiving great bodily harm. From its verdict, the jury appears to have believed Mr. Pittman's version of the events over Defendant's version. With Mr. Pittman's testimony, the State presented sufficient proof that Defendant was not in imminent danger of losing his life or receiving great bodily harm at the time he shot Mr. Walker.
In brief, Defendant cites factors from State v. Fielding, 37,943 (La.App.2d Cir.12/10/03), 862 So.2d 420, writ denied, 04-0249 (La.1/14/05), 889 So.2d 256, that the court should review in determining the reasonableness of the defendant's belief that he is in imminent danger of losing his life or receiving great bodily harm and that deadly force is necessary to save his life. The court should consider the excitement or confusion of the situation, the possibility of using force or violence short of killing and the defendant's knowledge of the assailant's bad character. Fielding, supra.
The evidence presented at trial does not support Defendant's contention that these factors support his self-defense claim. The general setting of drinking and socializing is not a situation of excitement and confusion that would make Defendant's actions reasonable, particularly given that it occurred every weekend. The Defendant testified that he did not see a weapon drawn, although he knew Mr. Walker carried one, suggesting that Defendant could have used force short of killing. Finally, Defendant and Mr. Walker had known each other for seven years and Defendant considered Mr. Walker his best friend. Defendant did not present any evidence of Mr. Walker's bad character. Defendant knew the victim to carry a knife, but this alone cannot justify the shooting. Any physical advantage due to age or size that Mr. Walker may have had over Defendant is not enough to justify the shooting.
After viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the State proved that the killing was not in self-defense. Accordingly, we find no reversible error in the jury's verdict in this case.

CONCLUSION
For the foregoing reasons, the conviction of Defendant, James Brown, is affirmed.
AFFIRMED.
NOTES
[1] The record shows that Mr. Pittman demonstrated how Defendant turned and pulled out the gun. Mr. Pittman states, "[h]e went down in here and got a pistol from under here." When asked to stand and show the jury, Mr. Pittman states, "[h]e went down in here."
[2] Ms. Ignot is referred to as both "Joanne" and "Joan" in several places of the record.